## GEORGE MORGAN vs. CITY OF DANBURY.

Third Judicial District, New Haven, January Term, 1896. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The plaintiff, a riparian and mill proprietor, alleged that the defendant, without making him any compensation or attempting to acquire any of his rights, was discharging and threatened to continue to discharge in still greater quantity, waste matter, sewage, and other noxious, corrupt and impure substances from its sewers into the stream, so as to pollute it and seriously damage his land and mill privilege; that such discharge poisoned and corrupted the air of the neighborhood and endangered the health of the plaintiff, his workmen and others, and had already partly filled his dam with filth and prevented him from disposing of his land for building purposes; and prayed for an injunction against the continuance of the nuisance and to restrain the pollution of the waters of the stream. The trial court found these allegations to be true, that the plaintiff's injuries could not be adequately compensated in damages, and that the acts complained of constituted a public

Morgan v. Danbury.

nuisance, and granted an injunction restraining the defendant, after twenty months from the date of the decree, from discharging any sewage into the stream above the plaintiff's premises, and from polluting the waters by any such discharge. *Held :—*

1. That the terms of the injunction decree did not go beyond the prayer for relief, but were fully conformable to the claims stated in the complaint.

2. That the term "sewage" in the restraining order, must be construed in the sense in which it was evidently used by the parties in their pleadings; and that so construed it signified and was confined to the refuse and foul matter, solid or liquid, which was discharged by the sewers into the stream; including such fluid portions as, if apparently innoxious when so discharged, might become by combination with other substances found in the stream, the occasion of decomposition and consequent pollution.

3. That the right to deposit a thing in any place must always be dependent not only on the nature of the thing deposited, but on the nature of the place in question and the uses to which that has already been put; and that if the stream was, from whatever cause, in such a condition that the defendant's discharge of sewage there worked a nuisance, it had no right to use the stream for such purpose.

The defendant claimed that the clause of the injunction decree which forbid the discharge of any solid matter which, though not foul and noxious, might be a source of deposit of filth in the plaintiff's mill-pond, was too harsh a remedy, since it might result in throwing a very heavy pecuniary burden upon the city, while on the other hand money damages would adequately compensate the plaintiff for such injury. *Held* that the finding that the plaintiff's injuries were, and would be, such as could not be so compensated, was a sufficient answer to that objection; especially as the city had the power, by the exercise of the right of eminent domain given it by the legislature for such purpose, to use the stream as it pleased.

[Argued January 23d—decided April 15th, 1896.]

SUIT for an injunction to restrain the pollution of a certain stream of water known as Still River, and injury to a mill privilege by the discharge of sewage, brought to the Superior Court in Fairfield County and tried to the court, *George W. Wheeler, J.;* facts found and judgment rendered for the plaintiff, and appeal by the defendant for alleged errors in the rulings of the court, and in its injunction decree. *No error.*

The complaint alleged that the plaintiff was a riparian proprietor and had the right to have the stream flow through his land uncontaminated and uncorrupted by any injurious

or noxious substances ; that since May 1st, 1889, the city of Danbury had unlawfully caused to flow into it, above his premises, large quantities of sewage and other noxious substances, thereby causing much thereof to become deposited on his land, so as to render the water noxious and filthy, and threatened to continue so to do, whereby he had been largely deprived of the use of the water and of his mill privilege, and exposed to unhealthy odors, and prevented from selling or disposing of his land, and his dam and water privilege had been partly filled up with filth, and encumbered, and placed in danger of destruction if the pollution continued; and that the city had done these acts without right or making him any compensation. The prayer was for an injunction against the continuance of said nuisance, and to restrain the pollution of the waters of said river temporarily and permanently.

The answer, as originally filed in 1893, denied the existence of any nuisance, and alleged that Still River had long been a non-potable stream and that the sewers were constructed in the performance of a governmental duty, and as the only practicable method of performing it. A supplemental answer filed in September, 1894, further alleged that the city had just completed the establishment of a sufficient deodorizing, disinfecting and purifying plant, on the outfall sewer, whereby its contents were rendered entirely harmless and no solid matter was permitted to pass into the river ; that any decree that might be rendered should be based on the present state of things, and that it was ready to have a decree passed that it should so purify and disinfect its sewer that it should discharge no hurtful matter into the river, but should continue to deodorize and disinfect it by the same means now being used effectually, or means similar thereto.

The finding showed these facts : Still River is a small and sluggish stream, emptying into the Housatonic sixteen miles below the city of Danbury. The wash of some of the city streets naturally flows into it. The plaintiff owned a large tract of land, on part of which was a mill and mill-dam, situated on Still River a short distance below the city. Other

riparian proprietors applied for admission as co-plaintiffs, and were heard in aid of the complaint upon the trial (Gen-Stat., § 1288), but no formal order for their admission as parties was made.

Danbury is sewered on a water carriage system, devised by competent engineers. The sewage and surface water were to be taken through the same conduits. There was to be a general or outfall sewer with lateral branches. Catch-basins were to be provided to intercept the wash of the streets and receive the sediment from it. The first sewers were built in 1885, and were, in conformity with the plan, discharged directly into Still River where it passed through the center of the city; it being the design to defer the construction of the outfall sewer for discharging the sewage further down stream, until the discharge above became a nuisance. The plan also contemplated eventually, when purification became necessary, the carrying of the sewage still further down, for deposit upon filter beds. By 1890 the number of sewers had been increased so far that their discharge produced a nuisance, and the city, in 1891, began to construct the outfall sewer, and completed it in 1892. Its mouth was nearly a mile below the former point of discharge, and upon land belonging to the city. Most of the existing sewers were connected with the outfall sewer, and discharged through it, but three were still allowed to discharge directly into the river in the center of the city. Several new sewers, built since 1892, have been also connected with the outfall sewer, and more sewers are needed, which would, if built, have a similar connection. The city has a population of about 20,000. In 1892, the city bought a mill-pond below the mouth of the outfall sewer and above the Morgan tract, for use as a basin to retain the solid matter issuing from the sewer. In 1894, the mill-dam was carried away by a freshet, and has not been replaced. If rebuilt, it would retain a considerable portion of the sediment, except in times of unusually high water. Even while it stood, however, it did not prevent the filling up, to a material degree, of Morgan's pond, and another mill-pond above that, belonging to some of the intervenors.

During the warm season, for five months in the year, Still River has scarcely any flow. In the fall of 1894, its average flow in September, at the mouth of the outfall sewer, was only five times greater in volume than that from the sewer, being 110,000 gallons of sewage to 569,000 gallons of river water.

All the water stored in Morgan's pond passes, in the dry season, in the daytime, through a bulk-head less than three feet square. Of late years, the volume of water in the river has diminished. Up to 1875, the water at Morgan's pond was generally potable; in 1880 it became much discolored; in 1882 cattle drank it. Up to 1885, it was used for washing clothes. Morgan then used his mill as a cider mill, but the sediment in the stream compelled him to stop washing his barrels in it in 1887, and in 1891 the pollution of the stream forced him to abandon that business.

Since the outfall sewer was put in, the cattle on the farms for six miles below have refused to drink from the stream, and the pollution of the water has been materially increased, not only by harmless matter, but by organic or putrefactive substances. The discharge of crude sewage from the outfall sewer will, from June to October, each inclusive, annually, be dangerous to the health and injurious to the property of the riparian inhabitants from the mouth of the sewer to a point six miles below.

At least 7,000 people use the outfall sewer, and large quantities of sediment from factories and streets also find their way into it. The sediment is deposited along the course of the stream for miles, spoiling the meadow grass, and emitting foul odors in warm weather. The river water is filled with a fine, slimy substance. Particles of human excrement, discharged from the outfall sewer, lodge on the bottom and banks of the mill-ponds, and the river banks below, though few are observable to the eye.

The city employed the chemist of the State Board of Health, in 1894, as an expert to testify at the trial of this case, and he reported to it that the discharge of crude sewage ought not to be allowed from June to October, each inclu-

sive, in any year. The city thereupon began in good faith to examine into methods to remedy the nuisance, and having determined, on the advice of experts, to use the Woolf disinfecting system during said five months, annually, established in the fall of 1894 a plant for this purpose 800 feet below the mouth of the sewer. It consisted of large vats of brine, from which a solution, known as hyperchloride of sodium, was developed by electric currents. The sewer was extended under these vats, and the solution flowed into it to disinfect and deodorize its contents before they were discharged into the river. A wire screen and an apparatus with revolving knives were also provided to catch and break up the solid matter, coming through the sewer, but they did not prevent the discharge of many solid particles into the river. Nine thousand dollars was thus spent. The plant had not been in use long enough, at the time of the trial, to enable the court to determine definitely whether it would disinfect the sewage in the sewer, but the discharge of sediment would not be materially lessened. It would not disinfect or deodorize the sewage that was discharged into the river, so as materially to decrease its pollution, or prevent the nuisances previously described.

The best plan of disposing of the city sewage is that of intermittent filtration. The only objection urged against it on the trial was its expense, which would be from $120,000 to $150,000. It can be used in connection with the existing sewer system of the city. No filter beds could be constructed above the Morgan property, or less than two miles below the present mouth of the outfall sewer. There is no practical way of disposing of the city sewage by discharge into Still River above the Morgan property, whether it be disinfected or not. To adopt the filtration plan would render the Woolf plant useless.

Acids and coloring material of various kinds have been, for forty years, discharged into Still River from numerous factories in Danbury. These have not added greatly to the sediment in the stream, but have discolored it, since 1876, for miles. Prior to the construction of the city sewer system,

there were several private sewers in Danbury, which discharged refuse and sewage into Still River. The plaintiff Morgan was not chargeable with any laches. He was already somewhat injured before he brought his suit, and this injury increased pending the action, and will greatly increase in the future. His damages are insusceptible of ascertainment in an action at law, and he will suffer irreparable injury if the discharge of sewage is continued. He has received no compensation from the city, nor has it sought to acquire any of his rights.

No objection was offered to the evidence of injuries suffered by the intervenors. As matter of law, it was also found from the foregoing facts that such discharge was a public nuisance.

The injunction granted was one " against depositing or discharging, or permitting to be deposited or discharged, any sewage through its drains and sewers into the Still River (so called) in said Danbury, above the premises of the plaintiff, situated at Beaver Brook in said Danbury, and described in the complaint herein; and against polluting the waters of said river by depositing or discharging, or permitting to be deposited or discharged, sewage through its drains and sewers into said river above the premises of the plaintiff, from and after the first day of May, 1897."

*Samuel Fessenden* and *Lyman D. Brewster*, for the appellant (defendant).

In going beyond the prayer of the plaintiff, and prohibiting the defendant from " discharging any sewage into Still River above the premises of the plaintiff," the court below erred. The prayer of the complaint is "against the continuance of said nuisance, and to restrain the said pollution of the waters of said river temporarily and permanently." In the English cases the form usually is " against the discharge of sewage to the injury of the plaintiff," or " unless and until the same shall be sufficiently purified and deodorized." *Attorney General* v. *Halifax Corporation*, 17 W. R., 1088. Seton on Decrees (3d Ed.) adds: " The form of this order

has been often adopted in similar cases," citing, *North Staf-ford, etc.* v. *Tunstall Local Board*, 39 L. J. Ch., 131. Similar language is used in the judgments in *Attorney General* v. *Birmingham*, 4 Kay & J., 528 ; *Attorney General* v. *Leeds*, L. R. 5 Ch., 583 ; *Nuneaton Local Board* v. *Gen. Sewage Co.*, L. R. 20 Eq., 127 ; *Crossley* v. *Lightwater*, L. R. 2 Ch. 478, L. R. 3 Eq., 279. See also *City of Atlanta* v. *Warnock*, 18 S. E. Rep. 135, 23 L. R. A., 301, and *Minke* v. *Hopeman*, 87 Ill., 450. The plaintiff's relief is limited by the prayer in his bill. *Ellis* v. *Sisson*, 96 Ill., 105. The unusual stringency of the injunction is the more unwarrantable in that the defendant has, as soon as it found the danger limit was reached, erected a plant under the advice of the most skillful engineers and health officers, and offers in its supplemental answer to conform in the use of that plant to the order of the court. Wood on Nuisances, § 823 ; *Green* v. *Lake*, 54 Miss., 540 ; *Minke* v. *Hopeman*, 87 Ill., 450 ; *Sellers* v. *Penn. R. R. Co.*, 10 Phila. (Pa.), 319.

*James H. McMahon* and *Charles W. Murphy*, for the appellee (plaintiff).

The injunction is no broader or more liberal than is necessary to protect plaintiff from the injuries to which he is exposed by the conduct of defendant. It appeared upon the defendant's own showing before the court that it never had been demonstrated by actual experiment, or in any practical manner, that its plant would be effective ; all defendant's claims were mere theories based on the testimony of experts, conflicting in its character; and the court having found that said plant *would not* and *could not* purify, etc., defendant is concluded thereby. There is no law which permits a defendant to expose such property rights as the plaintiff is found to possess, to such serious injury and destruction, and injure the health and comfort of this large community by its aggravating trespasses and nuisances, merely upon the plea that it would be put to great expense and trouble if compelled by said court to cease said nuisances. *Indianapolis Water Co.* v. *Amer. Straw Board Co.*, 57 Fed. Rep., 1004 ;

1 High on Injunctions (3d Ed.) § 746, and cases cited; *Pennington* v. *Brinsop-Hall Coal Co.*, L. R. 5 Ch. D., 770; *Attorney General* v. *Colney Hatch Asylum*, L. R. 4 Ch. 146. Equity will enjoin either jointly or separately, where the separate and concurrent acts of two or more occasion the injury. *Wood* v. *Sutcliff*, 2 Sim. N. S., 163; *Lockwood Co.* v. *Lawrence*, 77 Me., 297; *Woodruff* v. *North Bloomfield Gravel Co.*, 8 Sawyer, 629; *Coosley* v. *Lightower*, L. R. 3 Eq., 279; *Lambton* v. *Mellish*, and *Lambton* v. *Cox*, L. R. 8 Ch., 807; *Indianapolis Water Co.* v. *Amer. Straw Board Co.*, 57 Fed. 103. The discharge of sewage and other noxious matter into an inland stream, to the injury of a riparian proprietor below, has been held to be an unlawful invasion of the rights of said proprietor, remediable by injunction, by the courts of nearly every State, by the Federal courts, and by the courts of England. 1 High on Inj. (3d Ed.), § 810; 2 Beach on Inj., § 1094; 2 Wood on Nuisances (3d Ed.), § 777; *Goldsmith* v. *Tunbridge Wells Improvement Co.*, L. R. 1 Ch. App., 349; *Holsman* v. *Boiling Spring Bleaching Co.*, 1 McCart. (N. J. Eq.), 335; *Canfield* v. *Andrews*, 54 Vt. 1; *N. Y. C. & H. R. R. Co.* v. *Rochester*, 127 N. Y., 591; *Chapman* v. *Rochester*, 110 id. 273; *O'Brien* v. *St. Paul*, 18 Minn., 167; *Field* v. *West Orange*, 36 N. J. Eq., 118; *Danbury & Norwalk R. Co.* v. *Norwalk*, 37 Conn., 109; *Derks* v. *Commissioners*, 142 Ill., 197; *Gladfelter* v. *Walter*, 40 Md., 1; Gould on Waters (2d Ed.), §§ 544–546. By its own confession, the defendant intends, if permitted by the court, to continue to use said river as an open sewer, without any compensation to the plaintiff, and therefore without shadow of right. Such use is in utter contempt of the legal and constitutional rights of the plaintiff, and is a taking within the meaning of the law. *Winn* v. *Rutland*, 52 Vt., 481; *Harding* v. *Stamford Water Co.*, 41 Conn., 88; 2 Beach on Inj., § 1147; Cooley on Cons. Limitations, 551, 561.

BALDWIN, J. The defendant complains that the injunction granted by the Superior Court goes beyond the claim for relief in the complaint, because it forbids both the dis-

charge of sewage into Still River, and also the pollution of
the river by any such discharge.

The complaint alleged that the city was discharging waste
matter, sewage, and other noxious, corrupt, and impure sub-
stances, from its sewers, so as to pollute the river, and to
cause much of such discharges to be deposited on the plain-
tiff's land and mill privilege; and that thereby he had been
largely deprived of the use of a valuable mill and mill privi-
lege, he and his workmen injuriously exposed to noxious
odors, the air in the neighborhood corrupted and poisoned
so as to endanger the health of himself and others, his mill-
dam partly filled up with filth, the value of his property
greatly diminished, and he disabled from disposing of his
land for building purposes. It was also averred that the
defendant intended greatly to increase the pollution of the
river, and to cause much greater quantities of filth, poison-
ous and offensive matter to be deposited in the river, to his
irreparable injury, and that by the acts of the defendant,
unless restrained, his dam and mill-pond would be filled up
with filth and sewage, and the value of his land destroyed.
The relief claimed was an injunction "against the continu-
ance of said nuisance, and to restrain the pollution of the
waters of said river temporarily and permanently."

The nuisance thus complained of consisted, then, of dis-
charging into a river, above the plaintiff's premises, certain
substances of such a kind and in such a manner that the
water came to him polluted, and a deposit was made upon
his land and in his mill-pond, whereby noxious odors were
created, dangerous to his health and that of others, his dam
partly filled up by filth, and the use and value of his prop-
erty largely taken away; injuries which the defendant in-
tended to increase by enlarging its sewer system, and adding
to the amount of the deposits made from the sewers in the
river, the result of which would be to fill up his mill-pond
with filth and sewage, and make his property valueless.

These allegations were denied, but have been found true;
and there is nothing inconsistent with their truth in the
special finding of facts. They stated that the deposits from

the sewers both filled up the plaintiff's mill-pond, and polluted the air he breathed and the waters that flowed over his property. These, though proceeding from the same act, produced separate injuries. A nuisance was created with a double aspect. That to the waters of the stream and the air above it, it was found, constituted a public nuisance, though it was one which also wrought a special and peculiar injury to the plaintiff. That from filling up the mill-pond constituted simply a private nuisance. *Haskell* v. *New Bedford*, 108 Mass., 208, 216; *Brayton* v. *Fall River*, 113 Mass., 218, 229. It was proper that the injunction should be so framed as to protect the plaintiff against every serious and irreparable injury which he might suffer by the continuance of the nuisance, and its terms are fully conformable to the claims stated in his complaint.

The defendant contends that the decree is too broad, in that it restrains the discharge into the river of any sewage, even if not of a noxious, or polluting character, or though entirely and permanently disinfected and purified.

The primary meaning of the term "sewage" is that which passes through a sewer. Century Dict.; Webster's International Dict. A secondary meaning is derived from the usual character of the contents of a sewer, and as used in that sense the word signifies the refuse and foul matter, solid or liquid, which it so carried off.

In the plaintiff's complaint the connection in which the term is employed is such as to indicate that it was intended to carry the secondary meaning. He avers that the city is causing to flow into the river "large quantities of acids, impure substances, waste matter, contents of privies and cesspools, sewage, and other noxious, corrupt, and impure substances, so as to render the waters of said river at said property filthy, noxious and unclean," and that it intends to "greatly and wrongfully increase the pollution and defilement of the waters of said river above the said property of plaintiff, by building new sewers and connecting and using them and also old sewers or conduits with divers drains, cesspools, sinks and privies, and discharging their contents into

said river, and thereby cause to be deposited much greater quantities of filth, poisonous and offensive matter, than there otherwise would be in said waters of said river, to the great and irreparable injury of plaintiff's said property, and the increase of the poison and unwholesomeness of the air in that neighborhood." These acts, he alleges, have already endangered his health and that of others, by the noxious and unhealthy odors arising from the impure condition of the waters of the river, and have caused his millpond to be partly filled up with filth; and will, if continued, as the city intends, cause the pond to be entirely filled up with filth and sewage.

This use, in closing the enumeration of certain kinds of substances discharged into the river, of the words "sewage, and other noxious, corrupt, and impure substances," indicates that the sewage of which he complained was itself something noxious, corrupt, and impure; and the solid matter which thus came to be deposited upon his property he describes as "filth." The supplemental answer, setting up the establishment of the Woolf disinfecting plant, avers that the discharges from the sewer have thereby been rendered "entirely harmless and free from any offensive qualities, and no solid matter is permitted to empty from said sewer into said stream, but the same is liquefied and clarified, and the plaintiff is relieved thereby of all danger in the future from the said sewer, and the condition of the said Still River below the said outfall sewer, is rendered more pure and free from offensive matter than it would be if no outfall sewer was permitted, inasmuch as the electrolized salt water used to purify and disinfect the said outfall sewer, has also a disinfecting and purifying effect on the whole stream into which said outfall sewer enters." These allegations were denied, and the issues upon them have been found for the plaintiff.

The decree must be read in the light of the issues joined. Its use of the term "sewage" was that which the parties had made of it in their pleadings. Under the first of its prohibitory clauses, the discharge of no sewage is enjoined which is not either, if fluid, foul and noxious, or, if solid, either foul and noxious, or such as may be a source of the deposit of filth

in the plaintiff's pond. It is not impossible that fluids discharged from the sewer, although colorless, sterilized, and apparently innoxious, may yet be such as, by combination with other substances found in the river, to become the occasion of decomposition and consequent pollution; and the second prohibition of the decree makes proper provision for such a contingency.

The defendant urges that it should not be made responsible for the acts of others, and that if its sewage is thoroughly disinfected, sterilized, and purified, before its discharge into the river, nothing further should be required, even though as it flows down the stream it may be brought into contact with other substances, in such a way as to work a nuisance. But the right to deposit a thing in any place must always be dependent not only on its own nature, but on the nature of the place in question, and the uses to which that has been already put. A lighted match may be safely thrown into a brook, under ordinary circumstances, but not, should it happen to be covered with oil from a leaky tank.

If different parties by several acts foul the same stream, each may be enjoined against the commission of the wrong, with which he is individually chargeable. *Chipman* v. *Palmer*, 77 N. Y., 51. It is not for the defendant to dictate the order in which the plaintiff shall sue those by whom Still River has been polluted; nor would it be in any better position, if the noxious substances placed in these waters by others were so deposited by prescriptive right. If the stream is, from whatever cause, in such a condition that to discharge its sewage there works a nuisance, the city has no right to use its waters for that purpose.

It is insisted, finally, that the first clause of the order of injunction, which forbids the discharge of any solid matter from the sewers, that, though not foul and noxious, might be a source of the deposit of filth in the plaintiff's pond, is too harsh a remedy, since for any diminution in the storage capacity of his pond he could be adequately compensated in money, while, on the other hand, this part of the decree may result in throwing a very heavy pecuniary burden upon the city.

It is a sufficient answer to this objection that the Superior Court has found that the plaintiff's injuries are and will be such as cannot be redressed by an action for damages. That such well might be the case is quite obvious.

The city had, and still has, power, by the exercise of the right of eminent domain which the legislature has confided to it for such purposes, to acquire a title, as against the plaintiff, to use the stream as it pleases. The injunction was not to take effect until nearly two years from its date. We find nothing in the record to indicate that the Superior Court did not exercise a wise judicial discretion in passing the decree.

There is no error in the judgment complained of.

In this opinion the other judges concurred.