Williams, J.
The plaintiff sued for alleged violations, by the defendant, of his rights as a riparian proprietor. He is owner of two valuable farms, by or *458 through, which runs a small natural water course, known as the Rocky Fork of the Mohican river. Both of the farms are náturally adapted to, and have been used for agricultural and grazing- purposes. Each farm is improved, and each has on it a dwelling house, barn and other suitable buildings. One of them, known in the case as the “home” farm, is occupied by the plaintiff as his family residence, and had been for many years before the alleged encroachments on his rights by the defendant. The other he rents to tenants who occupy and cultivate it. The waters of this natural stream were accustomed to flow by and through these farms, supplying them, and their occupants, with pure and wholesome water in sufficient quantities for all domestic, agricultural, and other suitable purposes for which pure and wholesome water is generally used and needed upon a farm, until they were polluted and corrupted by the alleged acts of the defendant. The wrong complained of is, that the defendant, a city of something over eighteen thousand inhabitants, and situated on or near the water course above the plaintiff’s farms, by a system of sewerage emptying into the stream, caused to be collected and discharged into the stream, the sewage of the city, or a large part of it, which was carried down the stream to the plaintiff’s farms, where it accumulated and remained in large quantities. As a result of this alleged wrong of the defendant, the water Avas polluted, and rendered unfit for domestic and other ordinary uses; and, in time of freshets, the filth Avas washed out by the force of the stream and deposited on the plaintiff’s lands, destroying the grass and herbage, and causing offensive and unwholesome smells which materially interfered with the comfortable and proper enjoyment of *459 the premises by the plaintiff and his family. The suit was defended chiefly on the ground that the stream was corrupted, in part at least, by other independent sources over which the defendant had no control; .though the contention apparently most relied on in argument here, is that the city cannot be held liable for the acts complained of, in any event. In the court’s instructions to the jury the defendant’s liability was confined to such substantial injury as the plaintiff actually sustained in consequence of the alleged misconduct of the defendant, and his measure of recovry, if the issues were found in his favor, was limited to such an amount as would reasonably compensate him for the material interference with the comfortable enjoyment of his home farm, the proper and necessary use of the water to which he had hitherto been accustomed, including any additional expense rendered necessary in watering his stock, and the loss of his grass and herbage. His damages to the rented farm, the jury were instructed, could not exceed the actual loss resulting from a diminution in the rents, The charge given covered, substantially, all of the instructions requested by the defendant, except, probably, the second one which reads as follows: “The light of plaintiff to have the water descend on him in its pristine clearness, must yield to the demands of a denser population and the march of civilization.”
So that it must be^accepted as established by the verdict and judgments below, that the injury of which the plaintiff complains, was caused by the defendant, as claimed, and that, in consequence thereof he sustained substantial damage of that special nature and degree which would enable him to maintain action therefor if inflicted by an individual or private corporation. And, he is not without like remedy *460 against the defendant, unless, as claimed by its counsel, it has a paramount right, either by legislative grant, or from necessity for the preservation of the public health, safety, and welfare, to subject the water course to the uses it has made of it, without accountability for the destruction or material impairment of the-property rights of lower riparian owners.
The statutory authority for this immunity, it is contended by counsel, is found in sections 2232 and 2370, of the Revised Statutes. The former section provides that, a city may enter upon and hold real estate without its corporate limits, among other enumerated purposes, “for sewers, drains and ditches, and for this purpose the corporation shall have power to appropriate, enter upon and take private property, lying outside of the corporate limits.” The latter section authorizes municipal corporations to adopt a system of sewerage, “the main or principal sewers having their outlet in a river or other proper place.” The lawful exercise of the power conferred on municipal corporations to enter upon and take private property for any of the purposes enumerated by the former section, requires a legal appropriation, as that section indicates, involving the assessment of compensation for the property when taken without the owner’s consent. The stream in question in this case is not a river, a term that may import a stream of sufficient volume and flow to carry off sewage emptied into it, and thus preserve the purity of its water; nor, as will be hereafter noticed, can that be a suitable place for the deposit of sewage, within the contemplation of the law, where that will result in the creation of a public or private nuisance. But, the right of the plaintiff to redress for the injury done him, lies back of any mere authorization by the statute of the defendant’s *461 acts which inflicted the injury, and rests upon the constitutional guaranty which secures the inviolabilitv of private property, and the right of the owner to compensation when taken for any public use. Indeed, it appears to be a settled principle of universal law, independent of constitutional provision, that the right to compensation for private .property when taken for a public use, is an inseparable incident of the ownership of property. It is declared in Pumpelly v. Green Bay Co., 80 U. S. (13 Wall.), 166, that: “By the general law of European nations and the common law of England it was a qualification of the right of eminent domain that compensation should be made for private property taken or sacrificed for public use. And the constitutional provisions of the United states and of the several states which declare that private property shall not be taken for public use without just compensation were intended to establish this principle beyond legislative control.” And it was there held that: “It is not necessary that property should be absolutely taken, in the narrowest sense of that word, to bring the case within the protection of this constitutional provision. There may be such serious interruption to the common and necessary use of property as will be equivalent to a taking, within the meaning of the constitution. The backing of water so as to overflow the lands of an individual, or any other superinduced addition of water, earth, sand, or other material or artificial structure placed on land, if done under statutes authorizing it for the public benefit, is such a taking as by the constitutional provision demands compensation.”
In that case, a statute of Wisconsin authorized the construction of a dam across Fox river, in order to improve its navigation. The dam, which was constructed *462 in accordance with the provisions of the statute, caused the water to overflow the plaintiff’s lands on account of which he suffered substantial injury, for which he brought suit. It was claimed by the defendant that the damages sustained by the plaintiff were “such as the state had a right to inflict in improving the navigation of Fox river, without making any compensation for them ” Mr. Justice Miller, in resolving this contention against the defendant, said: “The argument of the defendant is that there is no taking of the land within the meaning of the constitutional provision, and that the damage is a consequential result of such use of a navigable stream as the government had a right to for the improvement of its navigation.
“It would be a very curious and unsatisfactory result, if in construing a provision of constitutional laAV, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that Avord, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common laAV, instead of the government, and make it an authority for invasion of priArate right *463 under the pretext of public good, which had no warrant in the laws or practices of our ancestors.”
And the learned justice, referring to the case of Gardner v. Newburgh, 2 Johns. Ch., 162, observed that: '“In the case of Gardner v. Newburgh, Chancellor Kent granted an injunction to prevent the trustees of Newburgh from diverting the water of a certain stream flowing over plaintiff’s- land from its usual course, because the act of the legislature which authorized it had made no provision for compensating the plaintiff for the injury thus done to -his land. And he did this though there was no provision in the constitution of New York such as we have mentioned, and though he recognized that the Avater was taken for a public use. After citing several continental jurists on this right of eminent domain, he says that Avhile they admit that private property may be taken for public uses Avhen public'necessity or utility requires, they all lay it -doAvn as a clear principle of natural equity that the individual Avhose property is thus sacrificed must be indemnified. And he adds that the principles and practice of the English government are equally explicit on this point. It will be seen in this case that it was the diversion of the Avater from the plaintiff’s land, which was considered as taking private property for pubiic use, but which, under the argument of the defendant’s counsel, would, like overflowing the land, be called only a consequential injury.”
And Mr. Justice Miller concludes that: “If these be correct statements of the limitations upon the exercise of the right of eminent domain, as the doctrine was understood before it had the benefit of constitutional sanction, by the construction now sought to be placed upon the constitution it Avould become an in *464 strument of oppression rather than protection to individual rights. But there are numerous authorities to sustain the doctrine that a serious interruption to the common and necessary use of property may be, in the languáge of Mr. Angelí, in his work on watercourses, equivalent to the taking of it, and that under the constitutional provisions it is not necessary that the land should be absolutely taken.”
Authors, who have fully investigated the subject, are quite agreed in their conclusions, that riparian rights are property rights, and therefore property, in the legal signification of the term, and within the meaning of the constitution. In Lewis on Eminent Domain, Vol. 1, Section 60, that author says that: “All the authorities agree” that small streams incapable of navigation “are wholly private property, and that the title of the riparian owner- extends to the middle of the stream.” And in Section 61 it is said that: “It may be laid down as a well settled principle that every proprietor over or past whose land a stream of water flows has a right that it shall continue to flow to and.from his premises in the-quantity, quality and manner in which it is accustomed to flow by nature, subject to the right of the upper proprietors to make a reasonable use of the stream as it flows past their land. , This right is a part of his property in the land, and in many cases constitutes its most valuable element. It necessarily follows, therefore, that any violation of this right in the exercise of the power of eminent domain is a taking of private property for which compensation must be made.” In Section 62 the rule is stated as follows: “Where the waters of a stream or any part thereof are taken or diverted to supply a city or village with water, or for the use of a canal or railroad company, or to improve a highway *465 by land, or to make a new-channel, either for the improvement of navigation, or for the protection of a public road, or for any other public use, compensation must be made to the inferior proprietors on the banks of the stream who are injured thereby. The only dissenting case which has come to our notice is that of the Commissioners of Homochitto River v. Withers, in which the Supreme Coúrt of Mississippi held that it was not a taking, to divert a stream of water from the plaintiff’s property into a new channel for the purpose of improving navigation. This decision is so palpably wrong that we do not think it requires discussion.”
“According to principles heretofore laid down,” says the same author, in Section 84, “it follows that an injury to riparian rights for public use is a taking for which compensation must be made. ‘These riparian rights founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be abridged or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that -(¡hey be taken for public use, upon due compensation.’ ”
In Mills on Eminent Domain, where the same doctrine is maintained, it it said, Section T9, that: “Riparian rights are property. Of this property the owner cannot be deprived without just compensation, nor can the state itself exercise such a power of deprivation, or confer it upon some subordinate municipality, without making compensation for the property taken.” And in Section 182 of the same work, it is laid down as settled law, that: “The legislative *466 authority to do an act resulting in damages to the property of an individual cannot be sustained, without the payment of damages, on the simple claim that the legislature cannot authorize that which is improper. It is beyond the power of the legislature to authorize the infliction of an injury without compensation. Charters should not be construed as evincing any legislative intention to authorize an injury, or to shield the corporation from a common law action, in case compensation is not provided. The fact that compensation is not provided should not lead the court to suppose that all injuries not provided for were declared by the legislature to be consequential, and, therefore, not subject to compensation.”
In Gould on Waters, Section 204, after declaring the right of riparian proprietors to have the stream “flow as it is wont by nature, without material diminution or alteration,” it is maintained that: “They may insist that their rights to thus use the water shall be regarded and protected as property. The right to use the water in its natural flow is not a mere easement or appurtenance, but is inseparably annexed to the soil itself. It does not depend upon appropriation or presumed grant from long acquiescence on the part of other riparian proprietors above and below, but exists jure naturae as parcel of the land.”
Wood on Nuisances, Section 332, speaking of the property rights of riparian owners, says, they are rights “in the owner of the soil which cannot be violated with impunity; rights which are distinct from those enjoyed by the public generally, and which exist not because of any special property in the water, but because of the OAvnership of the land over or through which it flows, and the rights that are necessarily created thereby.” These property rights, it is said *467 in the next section, “may he the subject of sale or lease like the land itself.” And in Section 427, speaking more directly to the question involved in this case, the author says: “The pollution of water by artificial drainage which causes sewage to flow into a stream, spring or well, whether done by a municipal corporation or an individual, constitutes a nuisance which entitles the owner to damages therefor, the rule being that a municipal corporation has no more right to injure the waters of a stream or the premises of an individual than a natural person.”
This subject is discussed in Angelí on Watercourses, where the doctrine announced in the quotations already made from other standard authors is fully upheld. In Sections 457, 458, that author says:
“Among the variety of legal titles which, in this country, have often been' involved in controversies respecting the rights of riparian proprietors on inland streams and rivers, is the important one entitled ‘eminent domain/ or the right which the government retains over the estates of individuals to appropriate them to public use. It is obvious, that the government of no state can administer its public affairs in the most beneficial manner to the community at large, if it cannot, on particular emergencies and for public utility, exercise at least a qualified power of disposing of, or of impairing in value, the property of an individual citizen. To this power, according to Yattel, ‘men have impliedly yielded, though it has not been expressly reserved.’ But it is a rule founded in equity, and is laid down by jurists as an acknowledged principle of universal law, that a provision for compensation is a necessary attendant on the due exercise of the power of the lawgiver to deprive an individual of his property without his consent.”
*468 Section 458: “In England, notwithstanding the transcendent power of its parliament, the law on this subject has been administered on the above just and equitable principles. In the familiar instance of an act of parliament, for promoting'some specific object or undertaking of a public nature, as a turnpike, navigation, canal, or railway, the legislature scruple to interfere with private property and compel the owner of the land to alienate it, without providing a reasonabl price and compensation for so doing. ‘If a new road,’ says Blackstone, ‘were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the OAvner of the land. ‘In vain may it be urged that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man, or even public tribunal, to be the judge of this common good, and to decide Avhether it be expedient or no. Besides, the public good is in nothing more essentially interested, than in the protection of every individual’s private rights, as modelled by the municipal law. In this, and in similar cases, the legislature alone, can, and indeed frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is considered as an individual, treating with an individual for exchange. All that the legislature does, is to oblige the owner to alienate his possessions for a reasonable price; and even this is an extension of power which the legislature indulges with caution.”
*469 It would not be a profitable extension of this opinion to quote from the numerous cases cited in the text books already extensively quoted to sustain the text. The substance of the many learned opinions of able courts is given in the quotations already made. We will add to them only a brief extract from the able opinion of Huger, C. J., in Seifert v. City of Brooklyn, 101 N. Y., 136, 143, 144: “It is a principle of the fundamental law of the state,”' says that learned judge, “that the property of individuals cannot be taken for public use except upon the condition that just compensation be made therefor, and any statute conferring power upon. a municipal body, the exercise of which results in the appropriation, destruction or physical injury of private property by such body, is inoperative and ineffectual to protect it from liability for the resultant damages, unless some adequate provision is contained in the statute, for making such compensation. The immunity which extends to the consequences, following the exercise of judicial or discretionary power, by n municipal body or other functionary, presupposes that such consequences are lawful in their character1, and that the act performed might in some manner be lawfully authorized. When such power can be exercised so as not to create a nuisance, and does not require the appropriation of private property to effectuate it, the power to make such an appropriation or create such nuisance will not be inferred from the grant. Where, however, the acts done are of such a nature as to constitute a positive invasion of the individual rights guaranteed by the constitution, legislative sanction is ineffectual as a protection to the persons or corporation performing such acts from responsibility for their consequences. Radcliff’e Exrs, v. Mayor, 5 N. Y., 195. It has been *470 sometimes suggested that the principle illustrated in the maxim, “sails populi est suprema lex” may be applied to and will shield the perpetrators, from liability for damages arising through the exercise of such power, by a municipal corporation; but we apprehend that this maxim cannot be thus invoked. Wilson v. Mayor, 1 Denio, 595. The cases where such a doctrine can be properly applied must, from the very nature of the principle, be confined to circumstances of sudden emergency, threatening disaster, public calamity and precluding a resort to remedies requiring time and deliberation. Wharton on Leg. Max., 89; Mayor v. Lord, 17 Wend., 285. It is suggested in the latter case that even in such an event, under the principles of the constitution, the public would be liable for the damages indicted. However this may be, we are quite clear that the theory that a municipal corporation has the right in prosecuting a scheme of improvements, to appropriate without compensation, either designedly or inadvertently, the permanent or occasional occupation of a citizen’s property, even though for the public benefit, cannot be supported upon the principle referred to. If the use of such property is required for public purposes, the constitution points out the way in which it may be acquired, when there is no such imminence in the danger apprehended as precludes a resort to the remedy provided, and the only mode by which it can be lawfully taken in such cases, is that afforded by the excuse of the right of eminent domain.”
There appears to be no diversity of opinion upon the proposition that riparian rights are property that may be the subject of bargain and sale, either with or separate from the land; that these rights constitute a part of the owner’s estate in the land, and materially *471 enter into the actual value; and that any injurious invasion, or impairment of those rights amounts to a taking of the owner’s property. It follows that no legislative sanction can justify the taking of such property, either' directly, or indirectly, though it be required for a public use, without adequate provision for a just' indemnity to the owner. To entitle the owner to such indemnity, it is not necessary that his entire interest in the particular property be taken. The value of property consists in the owner’s absolute right of dominion, use, and disposition for every lawful purpose. This necessarily excludes the power of others from exercising any dominion, use or disposition over it. Hence, any physical interference by another, with the owner’s use and enjoyment of his property, is a taking to that extent. To deprive him of any valuable use of his land, is to deprive him of his land, pro tanto. So that, the principle of the constitution is as applicable where the owner is partially deprived of the uses of his land, as where he is wholly deprived of it. Taking a part is as much forbidden by the constitution as taking the whole. This principle has been maintained by the former decisions of this court. In Reeves v. Treasurer, 8 Ohio St., 333, 346, where the use sought was for drainage purposes, this court said: “The land occupied by the ditch and its banks is not, it is true, wholly appropriated. The owner may still use the ditch itself for purposes of irrigation, for watering stock, or may perhaps make it serve the purpose of a fence. He may grow timber and shrubbery on its banks. But his dominion over it — his power of choice as to the uses. to which he will devote it, are materially limited; in short, other parties acquire a permanent easement in it. An easement is property; *472 and to the extent of such easement, it is clear to us, that private property is taken, within the meaning and spirit of the constitutional prohibition. The decisions in other states, on questions bearing on this point, seem not to have been uniform. Sedgwick on Const. Law, 519 et seq. But the doctrine here maintained is settled, in Ohio, by repeated adjudications, and on principles which, we think, cannot be shaken. Crawford v. Delaware, 7 Ohio St., 459.” And see Railroad Co. v. Commissioners, 63 Ohio St., 23.
There is a line of authorities which sustain the right of action in cases like the one before us, and place it upon the ground that such acts as those complained of here constitute a nuisance, which municipal corporations cannot, any more than individuals, be allowed to create or maintain. To this proposition, Judge Dillon, in his work on Municipal Corporations, Section 1047, adds the weight of his great authority: “It is, perhaps, impossible to reconcile all of the cases on this subject, and courts of the highest respectability have held that if the sewer, whatever its plan, is so constructed by the municipal authorities as to cause a positive and direct invasion of the plaintiff’s private property, as by collecting and throwing upon it, to his damage, water or sewage which would not otherwise have flowed or found its ■way there, the corporation is liable. This exception to the general doctrine, when properly limited and applied, seems to be founded on sound principles, and will have a salutary effect in inducing care on the part of the municipality to prevent such injuries to private property, and will operate justly in giving redress to the sufferer if such injuries are inflicted. Accordingly, though a municipality having the power to construct drains and sewers may lawfully cause *473 them to be built so as to discharge their refuse matter into the sea, or natural stream of water, yet this right must be so exercised as not to create a nuisance public or private. If a public nuisance is created, the public has a remedy by a public prosecution; and any individual who suffers special injury therefrom may recover therefor in a civil action. If, therefore, deposits from sewers constructed by a city cause a peculiar injury to the owner of a wharf or dock, by preventing or materially interfering with thé approach of vessels and the accustomed and lawful use of the wharf or dock, the city is liable to the latter in damages.”
In Wood on Nuisances, Section 427, the rule is stated as follows: “The pollution of water by artificial drainage which causes sewage to flow into a stream, spring or well, whether done by a municipal corporation or an individual, constitutes a nuisance which entitles the owner to damages therefor, the rule being that a municipal corporation has no more right to injure the waters of a stream or the premises of an individual than a natural person.” * * * “The pollm tion of water by discharging waste from mills and manufactories, or, indeed, in any way, creates an actionable nuisance, and the legislature has no power to authorize' the pollution of the water of a stream without compensation to the owners of the' land through which such stream flows, as such use is a taking of property within the meaning of the constitution. It has been held in numerous cases that a mu* nieipal corporation is liable for the wrongful diversion of surface water from its natural channel to the premises of another, as well as for discharging its drainage or sewage upon private property.”
*474 Other commentators of acknowledged authority maintain the same rule. A few only, of the many reported cases which sustain this doctrine, will be noticed. The case of Chapman v. City of Rochester, 110 N. Y., 273, is not substantially different from the one before us. There “plaintiff owned and occupied certain premises, across which ran a stream fed by springs of pure water. He collected the water of said stream into an artificial basin and used it for domestic purposes and the propagation, of fish, and in winter procured from it a supply of ice. Defendant thereafter constructed sewers, through which, not only surface water, but the sewage from houses and water closets was discharged into said stream above plaintiff’s land, rendering its water unfit for use and covering its banks with filthy and unwholesome sediment. Held, that these acts constituted a nuisance to restrain which, as well as to recover his personal damages, plaintiff could maintain an action.”
Morgan v. City of Danbury, 67 Conn., 484, is much like the preceding case. There “the plaintiff, a riparian mill proprietor, alleged that the defendant, without making him any compensation or attempting to acquire any of his rights, was discharging and threatened to continue to discharge in still greater quantity, waste matter, selvage, and other noxious, corrupt and impure substances from its sewers into the stream, so as to pollute it and seriously damage his land and mill privilege; that such discharge poisoned and corrupted the air of the neighborhood and endangered the health of the plaintiff, his workmen and others, and had already partly filled his dam with filth and prevented him from disposing of his land for building purposes; and prayed for an injunction *475 against the continuance of the nuisance and to restrain the pollution of the waters of the stream. The trial court found these allegations to be true, that the plaintiff’s injuries could not be adequately compensated in damages, and that the acts complained of constituted a public nuisance, and granted an injunction restraining the defendant, after twenty months from the date of the decree, from discharging any sewage into the stream above the plaintiff’s premises, and from polluting the waters by any such discharge.” And it was there held: “that the right to deposit a thing in any place must always be dependent not only on the nature of the thing deposited, but on the nature of the place in question and the uses to which that has already been put; and that if the stream was from whatever cause, in such a condition that the defendant’s discharge of sewage there worked a nuisance, it had no right to use the stream for such purpose.” And see Seifert v. City of Brooklyn, supra; City of Jacksonville v. Doan, 145 Ill., 23; Inman v. Tripp, Treas., 11 R. I., 520; Good v. Altoona, 162 Pa. St., 493; Owens v. Lancester, 182 Pa. St., 257. Mason v. City of Mattoon, 95 Ill. App., 525.
The right of the plaintiff to the relief awarded him by the judgments of the lower courts, is sustained by the case of Rhodes v. City of Cleveland, 10 Ohio, 160. That suit was brought against the city to recover damages for so cutting its drains as to cause the water to overflow and wash away the plaintiff’s lands. The trial court charged the jury that the plaintiff could not recover, “unless he showed either, that the city acted illegally, or if within the scope of authority, that they acted maliciously.” In reversing the judgment founded on the verdict for the defendant, this court held that: “Corporations are liable like individuals *476 for injuries done, although the act was not beyond their lawful powers.” The grounds of the decision are stated in the opinion by Lane, C. J., as follows: “That the rights of one should be so used as not to impair the rights of another, is a principle of morals, which, from very remote ages, has been recognized as a maxim of law. If an individual, exercising his lawful powers, commit an injury, the action on the case is the familiar remedy; if a corporation, acting within the scope of its authority, should work wrong to another, the same principle of ethics demands of them to repair it, and no reason occurs to the court why the same remedy should not be applied to compel justice from them.”
That decision is founded upon the broad principles of common justice and constitutional right. It is applicable to, and decisive of this case. No argument can be required to prove that, if the plaintiff’s riparian rights are property for which, when injured by an individual the latter may be held liable therefor in an action, they are none the less property when so injured or taken by the public; nor that those acts which, when done by an individual constitute a deprivation of the owner of his property, are equally so when done for the benefit of an aggregation of individuals that go to make* up the population of a municipal corporation. Nor, can it add anything to the> defendant’s prerogatives, nor take anything from the plaintiff’s rights, to call the injury he has suffered consequential. The owner is nevertheless deprived of substantial property interests, and no name by which the acts that produce that effect may be called, can destroy or diminish his constitutional right to indemnity.- The question whether the injury constitutes a taking of *477 property, depends upon its effect on the owner’s proprietary rights, and not upon the length of time necessary to produce that effect. They may he as effectually taken by continuing'acts extending over a considerable period of time, as by .a single act.
The case of Rhodes v. Cleveland, supra, has been repeatedly approved and followed in subsequent decisions of this court. In McCombs v. Akron, 15 Ohio, 474, 479, Read, J., after stating that “the sole question in this case is, whether a municipal corporation can be made liable for ah injury resulting to the property of another, by an act of such corporation, strictly within the scope of its corporate authority, and unattended by any circumstance of negligence or malice,” with his usual clearness and force, says: “The case of Rhodes v. City of Cleveland, 10 Ohio, 159, with admirable good sense and strength of reason, answers this question, by asserting .that corporations are liable, like individuals, for injuries, although the act was not beyond their lawful powers. The late learned Oh. J. Lane, who pronounced the opinion of the court in that instance, accounts for the older cases, upon the ground that courts were hampered by the mystic notion attached to corporate seals, by which corporations withdrew themselves from responsibility, and cast it upon their agents.' A sort of transcendentalism which enveloped both the courts and the profession in a mist growing out of the airy nothingness of the subject matter, enabled corporations, like the pestilence which walketh unseen, to do their mischief and escape the responsibility. It is refreshing to the jurist, and important to the rights of individuals, that these confused notions are yielding to a clearer light and more solid reason.” The learned judge further *478 said: “We recognize the doctrine of that case, as laid down by this court, as founded in the most solid reason, right and morals, and a majority of the court have not the slightest disposition to impair its obligation, but, by the light of such example and assurance, hope that the whole subject matter of corporations will in the end, be reduced to the control of incontestable principle.”
In Dayton v. Pease, 4 Ohio St., 80, 94, speaking of both of the above cases, Ranney, J., said: “In each of those cases, the liability of a municipal corporation, acting through subordinate agents, within the scope of its authority, and without malice or negligence, was enforced, where the acts.of such agents resulted in injury to the property of private individuals. The propriety of investing such corporations with the power to improve their streets, resulting often in indirect injury to private property, is conceded; but the cases rest upon the clear principle of right and justice, which requires compensation to go hand in hand with public benefit. And, when in the lawful exercise of these powers, private property must be injured for the common benefit of all, all should be held liable to make reparation; and, in the view of the judges who concurred in these decisions, the principle was not without support from that section of the constitution of the state, which secures the inviolability of private property.” The court, in Cohen v. Cleveland, 43 Ohio St., 190, 193, is not less emphatic in its approval of the doctrine of Rhodes v. Cleveland, supra. And see Youngstown v. Moore, 30 Ohio St., 133, 142, 143. It is true that the decision of Rhodes v. Cleveland, is not put expressly on constitutional *479 ground, though that ground is advanced in subsequent cases approving the decision.
We are satisfied, after the most careful consideration we have been able to give this case, that the judgments below are correct, and they are

Affirmed.

Minshall, C. J., and Burket, J., concur.