## CATHERINE MARKWARDT, v. THE CITY OF GUTHRIE

### a Municipal Corporation.

(Filed February 13, 1907.)

**MUNICIPAL CORPORATIONS—Maintaining Nuisances—Damages.**
Where a municipal corporation discharges sewage into a river or creek, polluting the water of the stream, causing it to become foul, and impregnated with noxious and poisonous substances, rendering it unfit for domestic or other uses, and thereby creating and maintaining a nuisance, which is detrimental to the health comfort and repose of a lower riparian owner and diminishes the value of his land such municipal corporation is liable for damages arising from the maintenance of such nuisance.

(Syllabus by the Court.)

*Error from the District Court of Logan County; before John II. Burford, Trial Judge.*

*F. H. McGuire* and *Devereux & Hildreth,* for plaintiff in error.

*James Hepburn,* for defendant in error.

#### STATEMENT OF FACTS.

This was an action commenced in the district court of Logan county, by Catherine Markwardt against the city of Guthrie, to recover damages alleged to have been sustained by her in consequence of the maintenance of a public sewer by said city. The petition in the case, omitting the caption, is as follows:

"The plaintiff, above named, complains of the defendant, and alleges:

"First:   That the defendant is a municipal corporation of the Territory of Oklahoma, duly organized, and a city of the first class, having a population of twenty-five (25,000) thousand inhabitants, and through which flows a stream of water, to-wit: Cottonwood creek.

"Second:   That she is and prior to, and at the time of, the commission of the grievance hereinafter mentioned was, lawfully seized in fee simple in and to the real property described as follows, to-wit:   Ten (10) acres in lot four, (4), of section five (5) township sixteen (16), north of range two (2) west in Logan county, Oklahoma Territory, included within the following boundary lines, viz:   Commencing at the northwest corner of said lot four (4) thence running east along the north line of said lot four (4), thirty-two (32) rods, thence south fifty (50) rods, thence west thirty-two (32) rods, thence north along the west line of said lot four (4) fifty rods to the place of beginning, through which flows the said Cottonwood Creek which with its shores and banks are included within said boundary lines and owned by plaintiff.

"Third:   That the plaintiff with her family is and was during the time above mentioned in the possession of said property and in the occupation of the dwelling house erected thereon.

"Fourth:   That prior to the commission of the grievances aforesaid the plaintiff at great expense improved said real estate, especially for gardening purposes in raising vegetables for market. The said improvements consist of a water reservoir 240 feet long, 65 feet wide and 14 feet deep, located near the bank of said creek, near which was, and is also erected and in operation a large windmill and water pump connecting said stream and reservoir, drawing an 11 inch

stream of water from said creek to said reservoir, keeping the same full of water, from which reservoir were also constructed to all parts of said land, ditches and drains used in irrigating said land from the waters of said creek through said reservoir, also a cold storage house and a warm storage house for the preservation of vegetables, both summer and winter; also hot house for the early propagation of esculent plants; also houses and barns for horses, cows, hogs, and poultry, necessary for the home and conduct of the gardening business; also the said reservoir was to its capacity stocked with a great supply of fish; also was kept thereon horses, cattle, and hogs, which had free access to said creek and reservoir for water; from which said, land, improved and used as aforesaid through the sale of vegetables, milk, butter and fish, the plaintiff realized and received large money profits and returns, and also supplies for family use.

"Fifth: That the waters of said Cottonwood creek flow north through and from the defendant city about one and one-half (1 1-2) miles to and through the plaintiff's land aforesaid, and that the plaintiff was entitled to have had, and ought still to have the use and benefit of the water of said stream for her horses, hogs and cattle, irrigation, and other purposes, yet, the said defendant, by its officers, agents and employes, well knowing the premises, did on the —— day of ——, 1902, wrongfully and unlawfully connect its sewer system with said Cottonwood creek at a point between said land and defendant city, so that all the excrement from the inhabitants of said city and their dwellings was and ever since has been wrongfully and unlawfully discharged into said creek. And the said defendant did then and thereby wrongfully and unlawfully pollute and disturb the water of said creek so that it became foul and impregnated with poisonous and noxious substances and emitted a noisome and poisonous stench, injurious to the health of plaintiff and her family and almost unbearable.

"Whereby, the enjoyment by said plaintiff and her family of the said land as a home and dwelling place has been and is interfered with, and the same has been rendered uncomfortable, unwholesome, and unfit for habitation; and the water of said stream has become unfit for stock, and the plaintiff will be compelled to resort to artificial means for water for her horses, cattle and hogs, and the ground has become so impregnated with the water of said stream that water from wells thereon is injurious to health and dangerous for domestic use; and the water of said stream has been rendered unfit for irrigation purposes by reason of the increased danger to health, and also rendering vegetables raised thereon, largely unmarketable through fear by consumers of contracting disease therefrom; and whereby the fish in said reservoir have died, and the said premises rendered useless for the purpose for which they were purchased and improved as aforesaid; by reason of which and all of which aforesaid the value of said land and premises was greatly depreciated to her damage in the sum of three thousand ($3,000.00) dollars.

"Wherefore, plaintiff prays judgment against said defendant for the sum of three thousand (3,000.00) dollars and costs of suit."

To this petition the city interposed a demurrer, on the ground that the petition did not state facts sufficient to constitute a cause of action, which demurrer was sustained by the court, and the plaintiff declining to plead further the cause was dismissed at the plaintiff's costs. From this ruling, order and judgment the plaintiff appeals.

Opinion of the court by

HAINER, J.: There is but one question presented by the record: Does the petition state facts sufficient to constitute a cause of action? And this presents for our considera-

tion the question whether a municipal corporation, which empties its sewage into a river or creek at a point some distance below the city limits, and on account of which sewage the water becomes foul, and impregnated with noxious and poisonous substances and unfit for domestic and other purposes, is liable to a lower riparian owner for maintaining a nuisance which interferes with the health, comfort and repose of such owner and his family, and diminishes the value of his land and premises.

It is conceded that, under the laws of this territory, a city of the first class has express authority to construct and maintain a sewer system within the city. A careful examination of our statutes discloses that the power to construct and maintain a sewer system is expressly delegated to cities of the first class only within the limits of said city, and there seems to be no express power conferred upon a city to extend a sewer system beyond the limits of the city; nor is there conferred on a city any express authority to use rivers, creeks, or other natural drainage courses for carrying off its sewage, or to deposit the same therein. Most of the states have statutes conferring such power upon cities. But in this case, the power, if it exists, is an implied power, indispensible to carrying into effect the express powers granted by the statute to construct and maintain a proper sewer system for the general health and welfare of the inhabitants of the city.

The contention of the city attorney is that since the legislature has conferred the power upon cities to construct and maintain a sewerage system within the city, that any damages that may arise to adjoining owners are merely consequential damages, which are not recoverable, where it appears that

no part of the premises are taken or in any manner invaded, in the absence of constitutional and statutory provisions authorizing a recovery under such circumstances. And it is insisted, that, since the plaintiff has failed to allege that the sewers were negligently, improperly, or unskillfully constructed, the petition did not state a cause of action, and that hence the demurrer thereto was properly sustained. The leading case in support of this doctrine is the case of *Transportation Company v. Chicago,* 99 U S. 635. And the same doctrine was re-affirmed in an elaborate opinion in the case of *Wabash Railroad Company v. Defiance,* 167 U. S. 88. But this reasoning is clearly based upon a mistaken notion of the basis of this action. The plaintiff is not seeking to recover for damages arising from the negligent, and unskillful construction of the sewer system, but the gravamen of the action is that the city is wrongfully maintaining a sewer, which has become a public nuisance, to the detriment of the health of the plaintiff and his family, and to the injury of his premises.

The great weight of the American and English authorities hold that a municipal corporation is liable for the wrongful maintenance of a public nuisance under such circumstances.

In *Edmondson v. City of Moberly,* 11 S. W. 990, the supreme court of Missouri had this same question under consideration. It appears that the city of Moberly was authorized by its charter to build and maintain a system of sewers for the drainage of its streets, etc., and for the maintenance of the public health. In 1885, under an ordinance to that effect, it constructed a number of sewers for the drainage of the

city. These drains, when completed, discharged the sewage finally into a small running stream or branch, near plaintiffs' residence, within the city limits. Plaintiff's evidence tended to show that this discharge was so filthy and noxious that it polluted the stream, produced a sickening stench upon plaintiffs' premises, impaired their enjoyment of their home, diminished its value, and caused sickness in their family. At the conclusion of the plaintiff's evidence the court declared the law to be that the plaintiffs could not recover. From this ruling and judgment the plaintiffs appealed. Justice Barcley, in delivering the opinion of the court, said:

"Conceding full effect of the authority conferred by the city's charter to establish a sewer system, it yet falls far short of legalizing the municipal acts here in question. The power granted was general. It did not expressly indicate and sanction the particular arrangement of drains adopted. Hence, the power itself must be regarded as subject to the just limitation forbidding its exercise in such manner as to create a nuisance injurious to private rights of property, where such a consequence is not a necessary result of exerting the power. This principle is now quite generally recognized as part of our American common law. Seifert v. Brooklyn, (1886) 101 N. Y. 136, 4 N. E. Rep. 321; Morse v. Forcester, (1885) 139 Mass. 389, 2 N. E. Rep 694; Railroad Co. v. Baptist Church (1882) 108 U. S. 317, 2 Sup. Ct. 719. It will not be necessary to elaborate the above statement of this rule, or to attempt to deal with the difficulties attending its practical application. That it governs this case we have no doubt. The evidence offered by plaintiffs tended to show that a nuisance, specially injurious to them, had been caused by the acts of defendant, and justified the submission of their cause to the jury. The wrong of which plaintiffs complain is not merely public in its effect. It is peculiarly injurious to them by reason of its proximity to their abode, in consequence of which

they sustain discomfort and annoyance, in the possession of their property, and a diminution in its value not shared by the community in general. Hence, it may properly be the basis of a private action by them."

In *Joplin Consolidated Min. Co. v. City of Joplin,* 27 S. W. 408, Chief Justice Black, for the supreme court of Missouri, says:

"The proprietor of land through which a stream flows cannot insist that the water shall come to him in the natural, pure state. He must submit—and that, too, without compensation—to the reasonable use of it by the upper proprietors and he must submit to the natural wash and drainage coming from towns and cities. But a city has no right to gather its sewage together, and cast it into a stream, so as to injure the lower proprietor. For damages thus sustained the lower proprietor will have an action, and, in many instances, injunctive relief. *Locks and Canals v. City of Lowell,* 7 Gray, 223; *Haskell v. City of New Bedford,* 108 Mass. 208; *Van Mills v. Nashua,* 63 N. H. 136; *Chapman v. City of Rochester* 110 N. Y. 273, 18 N. E. 88; Lewis, Em. Dom. sec. 65."

The supreme court of California in *Peterson v. City of Santa Rosa,* 51 Pac. 557 and *People v. City of San Luis Obispo,* 48 Pac. 723, holds that the pollution of water by the flow of sewage from towns and cities into streams, whereby the water is injured or rendered unfit for use, is an injury for which the city is liable, and goes even to the extent of holding that injunction will be granted to restrain the continuance thereof.

The supreme court of Pennsylvania has had this same question before it, in the case of *Good v. City of Altoona,* 29 Atl. Rep. 741, where it was said:

"The plaintiff is the owner of a farm situated three miles from Altoona, through which a stream known as 'Mill Run,' passes. The bed of the stream is limestone rock, through seams and fissures in which a part of the water finds a subterranean passage and feeds two springs near the farm buildings, from which water is procured for the stock and for domestic purposes. The city of Altoona constructed sewers, the contents of which flow into this stream, with the result to the plaintiff that the water of the stream and of the springs is so polluted as to be unfit for any use, and at times when the water overflows the banks of the stream deposits of filth are left on his fields. By digging wells he has been unable to obtain pure water, as on account of the crevices in the rock the whole underground supply is polluted, and he is unable to obtain water for use on his farm, except from a great distance and at great expense. The assignments of error raise two questions: First, whether there is any liability on the part of the defendant; and, second, whether the recovery, if any can be had, shall be for a permanent injury. These questions were both properly submitted at the trial, and the jury found that the act of the defendant destroyed or seriously impaired a property right which the plaintiff possessed in a stream, and that there was no practicable method by which this injury could in the future be averted, and that it was continuing and permanent."

In *Chapman v. City of Rochester,* 110 N. Y. 273, 18 N. E. 88, the court of appeals of the state of New York has upheld this doctrine. The plaintiff, who resided in the suburbs of the city of Rochester, had collected the waters of a stream, which arose in the city and flowed across his premises, in an artificial basin, for domestic purposes, etc. The city constructed sewers which discharged not only surface water, but the sewage from houses, and the contents of a large number of water-closets, into the stream above the plain-

tiff's land, so as to render the water unfit for use, and covered the banks with filthy sediment.   It was held that the plaintiff was entitled to damages for injuries to health and property, and an injunction restraining the nuisance.   Mr. Justice Danforth, speaking for the court, in the course of the opinion, said:

"In view of the principle upon which these and like decisions turn, the objections of the learned counsel for the defendant, against the judgment appealed from, are quite unimportant.   The filth of the city does not flow naturally to the lands of the plaintiff, as surface water finds its level, but is carried thither by artificial arrangements prepared by the city, and for which it is responsible.   Nor is the plaintiff estopped by acquiescence in the proceedings of the city in devising and carrying out its system of sewerage.   The principle invoked by the appellant has no application.   It does not appear that the plaintiff in any way encouraged the adoption of that system, or that by any act or word he induced the city authorities to so direct the sewers that the flow from them should reach his premises.   There is no finding to that effect, and the record contains no evidence.   In fine, the case comes within the general rule which gives to a person injured by the pollution of air or water, to the use of which in its natural condition he is entitled, an action against the party, whether it be a natural person or a corporation who causes that pollution."

This decision was approved by the supreme court of the United States in the case of *Missouri v. Illinois & Chicago District,* 180 U. S. 247.

One of the best considered cases that we have had an opportunity to examine is the case of *Platt Brothers & Company v. City of Waterbury,* 72 Conn. 531, 48 L. R. A. 691,

decided January 4, 1900. The entire subject is exhaustively treated, and the leading American and English cases reviewed. In the course of the opinion, Mr. Justice Hamersley said:

"The main contention of the defendant may be stated in this way: The use of the sewers under authority of the legislature in the manner described is a public, governmental use. The injuries to the plaintiff result from this governmental use, and are not direct, but merely consequential. The victim of consequential injuries resulting from a governmental use is entitled to no remedy unless one is given by statute. The defendant's charter provides no remedy for consequential injuries resulting from the use of said sewers. *Ergo* the plaintiff has no remedy, and its damage is *damnum absque injuria*. The premises essential to this conclusion are untrue. A governmental use may include any act which the state may lawfully perform or authorize. There are, however, governmental acts to which certain immunities attach, and it is with this restricted meaning that the phrase is used by the defendant. In this sense a governmental act is one done in pursuance of some duty imposed by the state on a person, individual or corporate, which duty is one pertaining to the administration of government, and is imposed as an absolute obligation on a person who receives no profit or advantage peculiar to himself for its execution."

And again the learned justice says:

"We think it evident that the mere granting authority to a city to construct, for the convenience and benefit of its inhabitants, sewers adapted to carry off their refuse matter to some neighboring stream, does not necessarily make such use of the sewers a governmental use, in the sense indicated. On the other hand, it is also evident that the legislature may impose the duty of constructing sewers in such manner as to make the performance of that duty a strictly governmental act. But, if, for the purpose of this case, we concede the de-

fendant's claim that the use is a governmental use, it is nevertheless liable to the plaintiff. The injury described by the complaint is not a mere consequential damage, like that resulting wholly from the lawful use of one's own property or the lawful exercise of governmental powers. It is a direct appropriation of well-recognized property rights within the guaranty of the constitution. 'The property of no person shall be taken for public use without just compensation therefor.' *Nolan v. New Britain,* 69 Conn. 681, 38 Atl. 707."

And again, in the same opinion, it is said:

"The right to pour into the river surface drainage does not include the right to mix with that drainage noxious substances in such quantities that the river cannot dilute them, nor safely carry them off without injury to the property of others. The latter act is in effect an appropriation of the bed of the river as an open sewer, and the proposition that it may become lawful by reason of necessity is inconsistent with undoubted axioms of jurisprudence. The appropriation of the river to carry such substances to the property of another is an invasion of his right of property. When done for a private purpose, it is an unjustifiable wrong. When done for a public purpose, it may become justifiable, but only upon payment of compensation for the property, thus taken. Public necessity may justify the taking, but cannot justify the taking without compensation. It may be necessary for a city to thus mix with its drainage such substances, but it is not necessary to pour such mixture into the river without purification. Indeed, the purification is coming to be recognized as a necessity. But, however great the necessity may be, it can have no effect on the right to compensation for property taken. The mandate of the constitution is intended to express a universally accepted principle of justice, and should receive a construction in accordance with that principle, broad enough to enable the court to protect every person in the rights thus secured by fundamental law."

In *Pumpelly v. Green Bay Company,* 80 U. S. 177, a similar question was before the supreme court of the United States, where Mr. Justice Miller clearly and forcibly states the doctrine as follows:

"The argument of the defendant is that there is no *taking* of the land within the meaning of the constitutional provision, and that the damage is a consequential result of such use of a navigable stream as the government had a right to for the improvement of its navigation.

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

And this question was also before the supreme court of the United States in the noted case of *Missouri v. Illinois & Chicago District,* 180 U. S. 208, where it was said:

"This case was brought by the state of Missouri against the state of Illinois and the sanitary district of Chicago. The latter is alleged to be 'a public corporation, organized under the laws of the state of Illinois and located in part in the city of Chicago, and in the county of Cook, in the state of Illinois, and a citizen of the state of Illinois.' The remedy sought for is an injunction restraining the defendants from receiving or permitting any sewage to be received or discharged into the artificial channel or drain constructed by the sanitary district, under authority derived from the state of Illinois, in order to carry off and eventually discharge into the Mississippi the sewage of Chicago, which had been previously discharged into Lake Michigan, and from permitting the same to flow through said channel or drain into the Des Plaines river, and thence by the river Illinois into the Mississippi. The bill alleged that the nature of the injury complained of was such that an adequate remedy could only be found in this court, at the suit of the state of Missouri. The object of the bill was to subject this public work to judicial supervision, upon the allegation that the method of its construction and maintenance will create a continuing nuisance, dangerous to the health of a neighboring state and its inhabitants, and the bill charged that the acts of the defendant if not restrained, would result in the transportation, by artificial means, and through an unnatural channel, of large quantities of undefecated sewage daily, and of accumulated deposits in the harbor of Chicago, and in the bed of the Illinois river, which will poison the water supply of the inhabitants of Missouri, and injuriously affect that portion of the bed or soil of the Mississippi river which lies within its territory. The bill did not assail the drainage canal as an unlawful structure, nor aim to prevent its use as a waterway, but it sought relief against the pouring of sewage and filth through it by artificial arrangements into the Mississippi river, to the detriment of the state of Missouri and its inhabitants. The defendants demurred to the bill for want of

jurisdiction and for reasons set forth in the demurrer. This court: *Held* that the demurrer could not be sustained, and required the defendants to appear and answer."

Accordingly, an answer was filed in the case, and a vast volume of evidence was taken, including much expert testimony as to the effect of sewage on the water and health, and the supreme court, after elaborately reviewing the evidence, decided, in the case of *Missouri v. Illinois and the Sanitary District of Chicago,* 200 U. S. 496, that the evidence was insufficient to sustain the bill, and therefore, dismissed the cause without prejudice. In concluding the opinion, Mr. Justice Holmes, speaking for the court, said:

"We might go more into detail, but we believe that we have said enough to explain our point of view and our opinion of the evidence as it stands. What the future may develop of course we cannot tell. But our conclusion upon the present evidence is that the case proved falls so far below the allegations of the bill that it is not brought within the principles heretofore established in the cause."

It will be seen that two important questions were decided in these decisions: (1) That the court had jurisdiction to hear and determine the controversy between the state of Missouri and the state of Illinois, and (2) that the bill stated facts which, if clearly and fully established by the evidence, would entitle the plaintiff to relief. It will also be observed that in these cases the state of Missouri did not allege or claim that the drainage canal was an unlawful structure, nor did it attempt to prevent its use as a waterway, but it sought relief against pouring sewage and filth through it, by artificial arrangements, into the Mississippi river, to the detriment of the state of Missouri and its inhabitants. So,

in the case at bar, the plaintiff does not aver or claim that the sewer was negligently, unskillfully, or improperly constructed, nor that the construction of such sewer within the city limits was wrongful or unlawful. Hence, the doctrine of consequential damages from the negligent and unskillful construction of a public work has no application to the case under consideration. And this case is clearly to be distinguished from the rule announced by our courts in the case of *Town of Norman v. Ince,* 8 Okla. 412.

The English courts have uniformly held this doctrine, and this rule is clearly stated in the case of *Atty. Gen. v. Leeds,* L. R. 5 Ch. 583, 588, 596. It appears that in England the protection of property from appropriation for public use without compensation does not depend on any fundamental law, but upon inherent justice, and the principle is carefully recognized in all legislation authorizing an infringement of private rights. So the legislative authority for emptying the sewage of cities into watercourses and rivers is coupled with the provision that no nuisance is thereby authorized. Such legislation protects private rights in a manner similar to our constitutional legislation. The city of Leeds, having obtained an act of Parliament for emptying its sewage into river Aire, claimed that the usual protection was not included in the act, and therefore the city was not responsible for nuisances maintained under an act of Parliament, urging the same plea of necessity pressed in this case. James, V. C., held that the act would not bear the construction claimed, and said he would be bound to put any construction on the act "which would prevent such a monstrous injustice." This decision was affirmed by the appellate court, Giffard, L. J.,

saying: "In construing the act one must always consider that, if it had a different meaning, it would be against common sense."

In *Carmichael v. City of Texarkana*, 94 Fed. Rep. 561, it was held that:

"A municipal corporation, though authorized by statute to construct sewers, has no right to so construct its system as to discharge sewage on the .lands of an individual, or in such place that it flows on his lands, and pollutes a watercourse thereon, or otherwise creates a nuisance by which he suffers damage."

In 2 Add. Torts, sec. 1085, the author lays down the rule that:

"Where commissioners of sewers and boards of health have obtained statutory powers of drainage into rivers, streams, and natural watercources, the power must be exercised so as not to create a nuisance, or interfere with the private rights of individuals. If a riparian proprietor has a right to enjoy a river so far unpolluted that fish can live in it and cattle drink of it, and the town council of a neighboring borough, professing to act under statutory powers, pour their house drainage and the filth from water-closets into the river in such quantities that the water becomes corrupt and stinks, and fish will no longer live in it, nor cattle drink it, the court will grant an injunction to prevent the continued defilement of the stream, and to relieve the riparian proprietor from the necessity of bringing a series of actions for the daily annoyance. In deciding the right of a single proprietor to an injunction, the court cannot take into consideration that circumstance that a vast population will suffer by reason of its interference. 'There are cases at law,' observes Sir W. P. Wood, V. C., 'in which it has been held that, where the question arises between two portions of the

community, the convenience of one may be counterbalanced by the inconvenience of the other, where the latter are far more numerous.   But in the case of an individual claiming certain private rights, and seeking to have those rights protected, the question simply is whether he has those rights and not whether a large population will be inconvenienced by measures taken for their protection.' "

And in section 1049 the same author says:

"Generally speaking, where local boards are authorized and required to execute drainage works in a particular district, and to make compensation to parties sustaining injury therefrom, they have no power to collect together the sewage, and pour it into streams which are previously pure, so as to create a nuisance, and deteriorate the value of the adjoining land.   A power to take possession of streams and to cover over open water courses for drainage purposes, and to give compensation therefor, gives to the board no power by implication to pollute water which was previously substantially pure."

Gould, in his work on Waters, section 220, says:

"A city has no right to discharge sewage in a stream so as to affect owners lower down on the stream.   The right to deposit a thing in any place must always be dependent not only on the nature of the thing deposited, but on the nature of the place in question, and the uses to which it has already been put, and if the stream was, from any cause, in such a condition that the defendant's discharge of sewage there worked a nuisance, it had no right to use the stream for such purposes."

And, again, the author, in section 544, says:

"The pollution of streams by municipalities and public bodies in charge of sewage and drainage has occasioned frequent exercise of the preventive powers of equity.   Upon

4—Vol 18

principle, a public body has no more right at common law than a private person. Its duty to prevent nuisances by taking care of the sewage or drainage of the district, gives it no right to create another nuisance by the pollution of a stream."

Our attention has been called to the decisions of the supreme court of Indiana, which seem to uphold the theory of the city. The leading case is that of *City of Valparaiso v. Hagen,* 54 N. E. 1062, decided October 25, 1899. It appears from the opinion that the city of Valparaiso is a city of 8,000 inhabitants. Salt creek is a natural water course flowing from south to north through the western part of the city, and thence west and north to its confluence with the Calumet river. Its fall is 15 feet per mile, and its minmum volume 227 cubic feet of water per minute. Within the city limits on the southwest is a low-lying marsh that naturally drains into Salt Creek. The natural and only practicable drainage for all the territory within the city limits is Salt creek. Prior to 1896 the city had constructed, according to law, a general and complete system of sewage for the city, at a cost of $50,000, and 200 closets and 500 kitchens had been connected therewith; and the outfall from the entire system was into the marsh at the southwest, at a point about 64 rods from Salt creek. About 47,000 gallons of sewage are being daily discharged into the marsh. The marsh is heavily overgrown with grass and other vegetation, but sewage in some form finds it way into Salt creek, and pollutes its waters. Above the point of sewage contact there are three slaughter houses that drain directly into Salt creek, and one rendering establishment and one gas works drain into near-by tributaries. Nine-tenths of 1 per cent. of the water in Salt creek

below the sewer discharge in time of low water is sewage coming from the city, the slaughter houses, and other polluting agencies above. Appellant is threatening and has arranged for an extension of the outlet directly through the marsh to Salt creek. The plaintiffs, 19 in number, are the owners and occupants of lower lands abutting on Salt creek at distances from two to ten miles from and below Valparaiso. The action is for an injunction precluding the city from discharging sewage into Salt creek.

In this case it was held:

"1. A city will not be enjoined from discharging its sewage in a natural water course, where it acts skillfully and in conformity to the statute, and is free from negligence, though the waters are polluted to the injury of lower riparian proprietors, where there is no other natural or reasonable possible means of drainage.

"2. The act of a city draining its sewage in a stream, thereby so polluting its waters that they destroy the pastures of a lower riparian proprietor in flood time and emit noxious odors to his personal injury, is not such a taking a private property for public use as must be preceded by just compensation.

"3. Injunction will not lie to restrain the exercise lawfully conferred on a city to construct a sewer until it has been abused to the injury of a public or private right."

It will be observed that this was an action of injunction, to restrain the city from maintaining its sewer system, and not an action for damages by a property owner who was injuriously affected thereby. Two points were decided by the court:   (1)   That injunction in such circumstances will

not be awarded; and (2) that the maintenance of such a sewer, no part of the premises having been invaded, did not constitute the taking of private property for public use to such an extent as must be preceded by just compensation. And upon a close analysis of this case it will be seen that the supreme court of Indiana did not decide that a property owner whose health was injured or impaired, and whose property was damaged, could not maintain an action, and recover damages for such sum as the facts and circumstances might warrant.

In the case of *City of Valparaiso v. Moffit,* 39 N. E. 909, the appellate court of Indiana seems to hold that the city is liable in damages for discharging sewage into a stream; but in the case of *City of Richmond v. Test,* 48 N. E. 610, the same court holds that the city is not liable under such circumstances.

It is difficult to reconcile these conflicting decisions of the Indiana courts. In the case last mentioned the decision appears to be based upon the theory that cities are not liable for consequential damages resulting from the construction, maintenance, or operation of sewers, streets, or other public works, in the absence of negligence, and where due care and skill are exercised, and the court quotes with approval the decision of the supreme court of the United States in *Transportation Company v. Chicago, supra,* where it was held that where the law authorizes a municipal corporation to construct a public work, it cannot be guilty of maintaining a nuisance so as to give a common law right of action. But, as stated before, the decision of the supreme court of the United States

in *Transporation Company v. Chicago,* while it held that that which the law authorized could not constitute a nuisance, is not in conflict with the cases cited in support of this opinion.

The construction of the sewer in the case under consideration did not, and could not, constitute a nuisance, because the statute authorized the construction of the sewer within the limits of the city of Guthrie. But this does not authorize the city to maintain its sewer in such a manner as to create or constitute a nuisance to the detriment of the peace, health and repose of an individual citizen, whose rights may be injuriously affected thereby.

The views announced are sustained by the overwhelming weight of the American, as well as the English authorities, and we think the principles herein announced are in consonance with right and justice. On the other hand, the contrary doctrine seems to have support in some Indiana cases; and, as it was stated in the case of *Platt Brothers & Company v. Waterbury, supra,* by Mr. Justice Hamersley:

"The theory of the defendant that the necessities of a city may not only justify the taking of riparian rights, but the taking without conpensation, seems to find support in some Indiana cases. * * * We do not find other cases that take this extreme ground."

General section 3433 of the statutes of 1893 defines a nuisance as follows:

"A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either: First, annoys, injures or endangers the comfort, repose, health or safety of others." * * *

And section 3442 provides that:

"A private person may maintain an action for a public nuisance if it is specially injurious to himself, but not otherwise."

From a careful examination and consideration of these authorities, and many others, we have reached the conclusion: (1) That the settled doctrine of the English courts, as well as some of our state courts, is that a lower riparian proprietor is entitled to recover damages for the pollution of the waters of a stream by a municipal corporation, by the discharge of sewage into the stream, on the broad ground of common sense and natural justice: (2) That the supreme court of the United States and a number of the state courts base their decisions on the ground that it is a taking of private property for public use, within the meaning of the federal constitution: (3) That other states hold that it is a damage to property, within the meaning of their constitutional inhibitions against the taking or damaging of property without just compensation; and (4) a number of the states hold that the lower riparian proprietor is entitled to recover damages for injury to his health, comfort and repose, on the ground that it is the maintenance of a nuisance. While these decisions are based upon different grounds yet upon whatever ground they may exist, they all, with the exception of the decisions of the Indiana courts, seem to uniformly hold that under such circumstances damages are recoverable; and many of them hold that where the evidence is clear and convincing, injunction will lie to restrain the continuance of the nuisance.

It follows that the plaintiff's petition stated facts suffi-cient to constitute a cause of action, and the court erred in sustaining the demurrer thereto.

The judgment of the district court is reversed and the cause remanded with directions to overrule the demurrer to the petition, and to proceed further in consonance with the views herein expressed.

Burford, C. J., who presided in the court below, not sit-ting; all the other Justices concurring.