ATTORNEY GENERAL, *ex rel.* TOWNSHIP OF WYOMING, *v.* CITY OF GRAND RAPIDS.

1. WATERS AND WATERCOURSES—MUNICIPAL CORPORATIONS—POLLUTING STREAMS—SEWAGE DISPOSAL—NUISANCE.

Evidence that the city of Grand Rapids casts sewage into Grand river in such quantities as to pollute the water, so as to give rise to unpleasant odors, and to cause deposits of disagreeable, deleterious and unhealthful material along the banks of the stream in a village seven miles below the city, that the board of health of a township bordering on the river had taken official action protesting against the pollution of the stream and declared the condition to constitute a nuisance, that the action of the city creates an unhealthful and unlawful condition, with evidence tending to show the effects so caused and the proper methods of sewage disposal, *held*, to require an injunc-

tion restraining the city from continuing to pollute the stream.[1]

2. SAME—EQUITY—INJUNCTION.

Equity has jurisdiction to restrain the pollution of a watercourse by casting sewage therein in quantities sufficient to occasion a nuisance to riparian proprietors or municipalities.

3. SAME—NUISANCE—PARTIES—ATTORNEY GENERAL.

The attorney general is a proper party complainant in a suit to enjoin the creation of a public nuisance by casting sewage into a river.

4. SAME—RIPARIAN RIGHTS—CITIES.

In determining whether a riparian proprietor, as a city, makes a lawful use of the waters of a river in disposing of its sewage, the test is whether the use made is a reasonable one or whether it unduly invades the rights of lower riparian owners: if it unreasonably pollutes the water so as to interfere with its lawful use, the act may be enjoined.

5. LIMITATION OF ACTIONS—PRESCRIPTION—NUISANCE.

To the injury of the public health a right to pollute a stream creating a nuisance cannot be gained by prescription: any increase or extension of such a claimed right would, in any event, be restrained.

6. CONSTITUTIONAL LAW—DUE PROCESS—MUNICIPAL CORPORATIONS —SEWERS.

Neither public necessity nor long usage will warrant a city in injuring the rights of riparian owners by polluting a stream with its sewers: such rights are as much protected by the Constitution as other property and cannot be taken except by eminent domain or other due process of law.

Appeal from the superior court of the city of Grand Rapids; Stuart, J. Submitted January 15, 1913. (Docket No. 112.) Decided May 28, 1913. Rehearing denied December 20, 1913.

[1]On the question of the liability of a municipality for pollution of waters by sewers, see note in 48 L. R. A. 691; 61 L. R. A. 694, 703, and 1 L. R. A. (N. S.) 124. And as to prescriptive right of municipality to pollute streams with sewage or other harmful substance, see note in 25 L. R. A. (N. S.) 589. And upon the right of a municipality to create nuisance by pollution at a point where its sewers discharge, see note in 20 L. R. A. (N. S.) 1050.

Bill by John E. Bird, attorney general, on the relation of the township of Wyoming, Nichol D. Emmons and others, against the city of Grand Rapids and others, for an injunction prohibiting defendant from casting sewage into Grand river. From a decree for defendants, complainants appeal. Reversed.

*Roger I. Wykes,* for complainants.

*Moses Taggart, Raymond M. Ferguson,* and *S. Eugene Hull,* for defendants.

STONE, J. This is a proceeding by information in the nature of a bill in equity filed in the name of the attorney general, upon the relation of the township of Wyoming, through its township board, its board of health, and its supervisor, and upon the relation of the village of Grandville in said township and certain riparian owners upon Grand river in said township against the city of Grand Rapids, its common council, its board of public works and board of health, to declare and to abate and restrain the continuance of an alleged public nuisance. The nuisance is claimed to result from acts of the city of Grand Rapids in conveying through artificial means its sewage into the Grand river, which flows down the river and is cast upon the lands below that city, and particularly upon those lands which are adjacent to and within the village of Grandville, and there to create a public nuisance. It is also claimed that the emptying of sewage into the river so pollutes its waters as to constitute a nuisance in the waters themselves by reason of the odors therefrom and the contamination therefrom.

The city of Grand Rapids is located upon both sides of Grand river; its population, in April, 1909, when the bill was filed, was upwards of 110,000; its sewage is carried into Grand river through sewers, which aggregate upwards of 171 miles in length, without

purification of any character. In addition to this, the night soil from the outlying houses, which have no sewer connection, is collected in barrels and dumped into the Prescott street sewer and flows into the river. The township of Wyoming is located south of the city of Grand Rapids; the river, after passing through the city, flows southerly and westerly between the townships of Wyoming and Walker. On the south bank of the river, at a point where it turns abruptly to the west, and about seven miles below the city of Grand Rapids, is located the village of Grandville, with about 750 inhabitants. Considerable of the area in Grandville is low; there is a ridge of high ground along the river bank, which is five or six feet higher than the low ground behind it.

It appears that the river overflows its banks once or twice a year; at these times of overflow a large area in Grandville is flooded and the river becomes very much wider than it is ordinarily, and the current increases rapidly. As the river goes down, and after the water ceases to flow back into the river, a pond of about 20 acres is left in the edge of the village; the escape of the water back into the river by flowage being prevented by the higher ground next to the river. The water left in this pond is from four to six feet deep, and gradually disappears through evaporation and seepage into the soil.

It is the claim of the complainants that the emptying of the large amount of sewage produced in Grand Rapids into the river contaminates its waters and fills them with impurities which are carried down the stream as it flows to, and into, or through the village; that, as the water goes down, the substances and impurities which are in it, due to the sewage, whether visible or invisible, are left upon the surface of the ground, and their decomposition creates such odors as to constitute a public nuisance in the village. The most of the houses in Grandville surround the flooded

area, and there are four houses and eight privies within the area covered by water in ordinary flood. There are many more houses and privies covered by the highest water known in Grandville.

The bill of complaint, among other things, states that the system of sewers in the city of Grand Rapids does not cover the entire city, there being about one-quarter of the inhabitants of said city who do not discharge their refuse of the character ordinarily discharged into and carried away by sewers into the sewers of the city, but who discharge and deposit their filth and noxious and unhealthful refuse into vaults and cesspools; that in the past such refuse, night soil, and unhealthy substances have been, and were at the time of filing the bill, collected by scavengers for said city and carried into the country, outside of said city, where the same was buried in deep pits, without creating any nuisance and without injury to the health of the surrounding neighborhoods; that there was, at the time of filing of the bill, under contemplation by the said city of Grand Rapids, and its said authorities had recommended, and intended, and threatened to put into operation, a plan whereby the said refuse and night soil, then collected by its scavengers, would be carried to and emptied into the said Prescott street sewer in said city; that the authorities had voted and determined to so dispose of this refuse and night soil, and they were about to commence the emptying of said sewage and night soil into the said sewer, and were at the time taking steps, or about to take steps, through the expenditure of public money, for the emptying of said refuse and night soil into the said sewer.

The bill states that the night soil so collected amounted at that time to from 150 to 180 barrels per day, and if emptied into said sewer would be carried into Grand river and would greatly add to the pollution and contamination of its waters, and that the

same would create a new public nuisance in the rendering of the waters of said river injurious to users thereof, and by the overflows of said river, and through deposits along the banks thereof, deleterious, unhealthful, and noxious substances, and, through the creation of noisome and unhealthful odors arising from the waters of said river when so contaminated, an additional public nuisance would be created; that the township board of health of the township of Wyoming had taken action in the matter in accordance with the statute, and had published its action, in which it protested against the emptying of sewage and night soil into said sewer, as contemplated by the city, and had declared the same to be a nuisance, and a source of filth and cause of sickness in said township, and injurious to the health of the inhabitants thereof. The bill further claims that said Prescott street sewer, which discharges into the said river in the southerly portion of the city of Grand Rapids, does not extend into the center of said river, or into the current thereof, but stops near the east shore thereof and at a point where there is very little current to the waters of said river; and that the effect of depositing such sewage at such point in said river will be to carry it only to the slow-moving and shallow waters of said river along the east shore thereof; and that the refuse and deleterious substances therein will, of necessity, be largely deposited along the banks of said river below the point where said sewage empties thereinto, and within the limits of said township of Wyoming. The bill further claims that the use of the waters of the said Grand river by the said city in the manner which was then contemplated would be improper, unwarranted, and unlawful, and would constitute a daily menace to the lives, health, and comfort of the persons residing along said river, and in the township of Wyoming, and in the village of Grandville, and would fill the air with noisome and noxious odors and pollute

the air in the neighborhood and render it unfit to breathe; and that the said city could satisfactorily and economically dispose of its refuse matter, night soil, and sewage in other manner or through different methods than were then contemplated, without injury to the health or lives of persons, and without creating a public nuisance.

The bill prays that a permanent injunction be granted against the city of Grand Rapids and its said boards, officers, and agencies restraining and preventing it, or them, from continuing to discharge its sewage, which it then discharged into Grand river, and requiring it to abate the nuisance which it then maintained in the pollution of the waters of said river. It also prayed that an injunction issue restraining said city and its said officers and agencies from carrying into effect their threatened and contemplated plan of emptying into said sewer the refuse matter and night soil then being collected by the scavengers of said city for the purpose of conveying the same into the Grand river; and that they be restrained and prohibited from taking any action, or in any manner ordering the performance of any act on the part of any of its officers or boards having the tendency to carry into effect the said threatened action, which would result in said nuisance.

By their answer the defendants, among other things, admitted that the system of sewers in the city of Grand Rapids did not cover the entire city; but they claim that the sewage of the character complained of, as contemplated to be emptied into the Prescott street sewer, did not amount to more than 10 or 15 per cent. of the sewage of the city; and that the only reason why such night soil was not carried into the sewers of the city was because the buildings from which it was taken were not within a practicable distance of the sewers of the city that had been established; and that it was the policy of the city, and had been at all times, to extend its sewers as fast as pos-

sible, and to make connections with buildings and houses that were theretofore unconnected with the city's sewer system. They admitted that for several years past such night soil had been carried into the country outside of the city and buried in deep pits, but stated that the townships of Wyoming and Walker had strenuously and vigorously objected and forbidden the city officials from taking such night soil into their townships at any point that it was practicable to take the same. The answer further admits that the city and its officers had not only in contemplation, but had practically completed and carried out, at considerable expense, the construction of the Prescott street sewer, and had planned and prepared a large manhole within 35 or 40 feet of the banks of the river in which to cast such night soil, to the end that, when the same should be fully disintegrated into small particles, it would be forced through such sewer into the river; that the stream of water that would be used for such purpose would have a force of 60 pounds to the square inch and upwards, so as to completely and thoroughly disintegrate the same and carry it into the river in better shape and condition than that from the other sewers of the city that had been in use for 30 or 50 years; that 90 per cent. of such sewage was liquid, largely water, used in the gathering of such night soil from various vaults in the city not connected with the city sewers; that the reason why this plan was adopted was the hostile position taken by the several townships and township boards around the city, and particularly the township of Wyoming, which attempted to force upon the city the removal of such night soil such a distance therefrom as to be prohibitory. The defendants further say that before the adoption of this plan, having in mind the objections of the township officers of the township of Wyoming, they consulted with the executive officer, Dr. Shumway, of the State board of health,

and with the member of the State board of health, resident in the city of Grand Rapids, Dr. M. C. Sinclair, and with the members of the medical profession, members of the board of health of the city of Grand Rapids, and this plan was approved of by the secretary of the State board of health and other officers mentioned; that it was only expected to carry this plan out until the various residences not connected with city sewers could be brought into connection therewith and the sewage carried away in the ordinary manner; that the secretary of the State board of health and other officers named all agreed that the manner in which the night soil would be disposed of under this plan would not materially add to the pollution of the waters of said river, and could not be carried upon the banks of said river in the vicinity of Grandville in solid form or substance; that if any of it drifted upon the banks of the river it would be in liquid form, or in such small particles as not to be discernible or to materially affect or injure the soil upon which it might be deposited; that by the rays of the sun and the atmosphere it would soon become oxidized so as to be absolutely innoxious and inoffensive; and that any odors that might be discovered upon the banks of the river after the abatement of its floods would be caused far more by decaying vegetation or vegetable matter than by any possible particles of substance of sewage from Grand river.

The answer denies that the city could practically dispose of such night soil and sewage in any other manner or different method than that which had been followed in the main for the last five years or that was proposed for the disposition of the night soil where residences are not connected with the public sewers of the city, and denies that whatever the city has done, or is about to do, has or would constitute a menace to the health of the residents of the township of Wyoming or the village of Grandville, or would create a

public nuisance; it denies that carrying out the plan that was then proposed would be any nuisance or continuing nuisance within the said township or village. The answer further states that if the city shall be enjoined and restrained from the removal of its night soil in the manner which has been so planned and approved by its city boards for the disposal of sewage, it will be liable to lead to dangerous pestilence and disease in the city of Grand Rapids and endanger the health of its more than 100,000 inhabitants.

Upon the issue formed by the filing of the general replication by complainants, a great volume of testimony was taken before a special commissioner and about 60 witnesses examined. The case presents largely a question of fact, and it may be said that the question is not so much one of the right of the city to create a public nuisance through emptying its sewers into a public stream as it is a question of fact whether the proof makes out such a nuisance. We have spent much time in the study of this record and the examination of the testimony pro and con upon the main issue. More than 20 witnesses, most of them residents of the village of Grandville and vicinity, gave affirmative and positive testimony tending to support the allegations of complainants' bill.

The complainants' case is predicated upon the claimed creation by defendants of a public nuisance at Grandville and along the river bank in Wyoming township through the discharge of sewage into the river. The testimony on behalf of complainants supports the claim that a nuisance has been created and largely augmented of late years through the discharge of additional sewage in the manner described. For the most part the testimony relates to the conditions at Grandville which is located upon the river bank. The conditions at Grandville, owing to the peculiar lay of the ground and the fact that it is at a bend in the river, makes it the point where the effect of the

deposits of sewage in the river is most readily felt. The testimony of the secretary of the Grand Rapids board of health, taken from the public records, shows night soil collection as follows:

|  | Vaults Cleaned. | Barrels Handled. |
|---|---|---|
| April 1, 1907, to April 1, 1908....... | 6,620 | 24,704 |
| "   " 1908,  "     "   " 1909....... | 6,211 | 21,474 |

It is undisputed that this night soil was collected from the outlying districts where they have no sewerage connections; and that from September, 1909, it has been emptied into the Prescott street sewer, pursuant to the action of the board of public works and the board of health of Grand Rapids. This witness testified that they began emptying into the Prescott street sewer the fore part of September, and had continued it down to the time of his testifying. It further appears undisputed that, in the 15 years before the bill of complaint was filed, the miles of sewers in operation in Grand Rapids had increased from 87 to upwards of 171, an increase of nearly 100 per cent.

We cannot undertake to quote at length from the testimony of the numerous witnesses examined in the case. It does appear that the testimony of the creation and existence of a nuisance at Grandville is that of well-known citizens (residents of the territory affected) who have resided there for many years and who claim to speak from actual knowledge of the conditions testified about. The testimony of these witnesses is uniform and to the effect that the stench and odors at Grandville arising from the river, and especially from the territory overflowed after the water receded, had been so nauseating as to be almost intolerable. Cellars were filled in many instances, and it appeared that after the water receded there was a sediment over not only the ground, but in the cellars, of a sticky, slimy nature; that there had been general

175 MICH.—33.

complaint of this odor. Numerous witnesses, including a number of physicians, testified that this odor was that of sewage, and that in many instances organic substances were discovered at and near the village of Grandville. Many witnesses testified that this was not an odor of decayed vegetation but decomposing sewage; that cattle refused to drink the water of the river; the ice was unfit for use; and that the fish had been killed or driven away in the last five years.

Dr. Henry B. Baker testified, on behalf of complainants, that from 1873 to 1905 he was secretary of the board of health of this State; that he had lately been at Grandville and examined conditions there, and how the waters overflowed and stood stagnant. He estimated that about 20 acres would be covered with water if it stopped running back over the banks; that the flooding of the area usually flooded at Grandville would be apt to produce a smell caused by the decomposition of sewage; that if 12,000,000 gallons, or thereabouts, go into the river daily, and the water containing it spreads out in Grandville, in his judgment there would be enough left on the ground to produce an odor. He also testified that he examined some ten privies around the flooded area. In his judgment there would be about eight that the water would get into; that there would be no great amount of odor at Grandville when the waters receded by reason of the privies; there would not be any that would spread out over 20 acres. If the privies were used by 50 persons, there would be 5½ times as much excreta thrown into the river each day from Grand Rapids as deposited in the privies in 365 days. The residences surrounding the overflowed area get their water supply from the wells. The sewage of the city coming in there year after year would eventually contaminate the soil to a considerable extent and might injure the water supply; the privies themselves would do so; that the privies seemed to be built up around,

so that the water would not take up much of their con-
tents; some might percolate, but it would not be likely
to; they were all inclosed so far as he could observe.
He further  testified that the  principal  water-borne
diseases are diarrhea, dysentery, typhoid fever, and
cholera; that, while it is possible to convey by water
almost any communicable disease, it is not commonly
done; that epidemics of this typhoid occur without
any previous warning, and the fact that there had
been no epidemic of this disease in Grandville is no
guaranty that it will not come; that it is common for
an epidemic of disease to come without explanation;
the explanation may be found later.  He would not
advise the use of those wells at Grandville; that he
left advice with the village authorities that no unpro-
tected privies should be left there; that it would not
be safe to use the wells if the privies were taken care
of and the sewage was still permitted to come in; that
the odor of decomposing sewage has peculiarities by
which it can be distinguished from decaying vegeta-
tion; the ordinary observer who has smelled both can
distinguish; any person who could tell the difference
in passing a privy or a horse stable would be com-
petent to tell the difference between decomposing sew-
age and vegetable matter; that the sewage of Grand
Rapids emptied into the river would not purify itself
in going the seven miles necessary to reach Grand-
ville; it would be decomposed very little, the time of
its being in the river would not be very long; that
dumping into the river daily 150 to 200 barrels of night
soil collected from outhouses would tend to increase
the odors; in his judgment it would increase them over
the same amount of sewage going in in the ordinary
way, as decomposition has advanced, and the odors
would be more strongly developed in the stored excreta
than in the fresh sewage.  In his opinion germs would
not be likely to cause disease unless they percolated
into the water supply.  As secretary of the State board

of health he was called upon to advise the cities as to sewage disposal plants; that he advised the one installed at Jackson, which included a septic tank and purification apparatus, by the use of which appliances a large portion of the contaminating matter is removed from the sewage; there is sedimentation of sewage in a slow-moving stream; that the matter which settles is not purified by settling unless sufficient time elapses to let it decompose; that fish do not thrive in sewage contaminated streams; that sewage in high water would be more diluted than when there was not a flood. He testified that all streams of Michigan are more or less polluted (Detroit river below Detroit, and Grand river below Jackson, Lansing, Ionia, and Portland); that there would not be very much odor from the river at the time of a freshet; the odor would come later, when the atmosphere was warmer. If the banks overflowed in March he thought the odor would come more during the hottest months; that the sun helps to decompose the material, which might last through July and August. This witness testified with reference to the odors from glue factories and tanneries; that most of us could tell the odor from a glue factory or tannery, and either of them from sewage, but to describe the difference would be difficult.

The witness George S. Pierson, called by complainants, testified that he was a civil engineer and had made a specialty of sanitary engineering for 25 or 30 years; that his work in a large measure required the supervision of plants for water purification and installation of septic tanks; that he had supervised sewage purification plants at Hermosa, Cal., El Paso, Tex., Marshalltown, Iowa, Fond du Lac, Wis., Jackson, Durand, Ithaca, Bay View, Charlevoix, and Lake Cora, Mich., and quite a number of smaller installations; that he had visited most of the plants in operation in Massachusetts, including those in Worcester, Amherst, Andover, Gardner, Framingham, Natick, Brockton,

Lawrence, and others; that those plants were in successful operation when he visited them; that he had experience in estimating the cost of erection and maintenance of such plants. The witness described modern methods of sewage disposal, including septic tanks; and that the septic tank is almost universally used in this country in the first, and even in the final, stage of the process; that this accomplishes sufficient purification of sewage so that it can be emptied into a stream without damage or creating a nuisance; that the septic tank process is in successful operation in cities the size of Grand Rapids; that the recent tendency had been to relieve streams from pollution by purifying the sewage; that a sewage purification plant for a city the size of Grand Rapids is feasible; that the cost of operation of a septic tank is nominal, only an occasional cleaning, at periods varying from three months to six years; that the water consumption of a city is an indication of the amount of its sewage, because practically the entire water consumption finds its way into the sewers; this may be increased by rains carrying with them the street washings; that, in providing a septic tank, to ascertain its size we ascertain the daily total flow. The witness further testified that he had made a general estimate which would be sufficiently large to cover the cost of a sewage disposal plant for Grand Rapids, and he could positively say the cost would not exceed his estimate; the approximate cost would be $1 per capita; for a city the size of Grand Rapids it would be about $100,000; this is based upon separate septic tanks, without the cost of connecting the sewers; that the cost would not vary much whether one or more tanks were used; that, if a separate tank were installed at each sewer outlet, the cost would be slightly more, probably not more than 25 or 50 per cent.; that there is a slight odor from a septic tank, not materially different from the odor of any sewer discharge; if the

tank discharges below the water level, the odor is masked; the septic tank alone reduces the amount of organic matter in the sewage and the number of disease germs and brings it into such condition that upon discharge it is rapidly purified; that the odor would not last long after the discharge; it would be very much minimized from the sewage being put into the water, and the duration of the odor would be less, and it would disappear within a very few hours; that in his judgment the sewage of Grand Rapids in Grand river would not purify itself before it reached Grandville; that unless the stream has a very rapid flow there is immediate sedimentation when sewage is discharged into a watercourse; that it continues until a good part of the solids are lodged on the bottom of the stream; that, if there is a considerable sedimentation between Grand Rapids and Grandville, the effect of high water would be to dislodge it and carry it on; that the pollution of the stream at that time would be much increased from what it would be if the current did not take up this discharge; that the increased pollution of the water caused by this would be apt to leave deposits at Grandville that would increase the smells.

On cross-examination the witness testified that his statement as regards the sediment on the bottom of the river was not based on actual tests in Grand Rapids; that it depended to a considerable extent on the rapidity of the flow; that material settling to the bottom of the stream would not cease to be contaminating for quite a long time and would never become pure with additional material from day to day; that he was not familiar with the river between Grand Rapids and Grandville; that sewage odor from a stream within clearly-defined banks would not be particularly noticeable for a great distance; it might for five miles, but would be reduced; that he had made no test between Grand Rapids and Grandville to see what settles to the bottom of the river; that his statement

was general from what he supposed, and that he did not know the velocity of the stream between the two points; that while there is no great amount of purification in a sluggish stream in a distance of six or seven miles, the faster a stream flows, the further the impurities are carried in a given time; that it might be said it was the general rule in Michigan for cities having sewer systems to carry the sewage into streams; that Grand river at Jackson is smaller than at Grand Rapids, and that Jackson has the largest municipal sewage reduction plant that he knows of in this State; that the sewage there is purified by filtration; that the largest plant he ever established is at Auburn, N. Y. (50,000 to 75,000 inhabitants); that Worcester, Mass., with a population of 125,000 to 150,000, has such a tank; that the contaminating influences of the sewage of a city the size of Grand Rapids would not be as great if the sewage were not carried into the river by artificial means as there would be purification of the organic matter by the soil; and if it were not for the sewers there would be very little contaminating influence upon the waters of the river.

Dr. J. D. Brook, a witness produced by complainants, testified that he had resided in Grandville since 1892, and had been health officer of the township for five years, and was familiar with the portion overflowed in high water. He testified that at times there were probably 100 acres overflowed within the corporate limits, and that there are dwellings in and around the overflowed area; that when the water recedes a pond is left in the village, the escape of the water being cut off by the river bank; that this pond is 20 to 25 acres in area; that it takes a couple of weeks to soak away when the water recedes; that there was an unpleasant odor perceptible in different parts of the village; that the odor after the June flood, 1904 and 1905, was the worst; that he had noticed the

same character of odor after each of the floods; that he was familiar with the odor left by the overflow of the waters of running streams, and that the smells arising from the overflowed bottoms at Grandville are not of that character; that he had noticed odors along the river where there were no wing dams; that the water is left behind the dams in stagnant pools, with a green scum on it, and the odor from the river came from the water. He noticed that the water contained foreign substances, particles very distinctly seen with the naked eye and able to be measured, if caught; that he had noticed an odor to the river as far down as Grandville; that ever since 1904 there had been considerable complaint about the condition of the river and conditions at Grandville caused by it. He testified as to the privies in Grandville, but in his judgment the privy deposits did not add to the contamination of the water on the surface. This witness testified that he knew sewage causes odors in the river, because it smells like sewage; that he could tell the difference between the odor of a gas plant and sewage; the difference is hard to describe—one is decomposing odor, and the other more like the odor of gas. The witness testified, that in November, 1908, he took two samples of water from Grand river for analysis, one at North Park bridge in the upper part of the city, and one opposite Grandville, both being taken from the center of the stream; that he took eight ounces at each point, and endeavored to get a fair sample of the water; that he sealed, marked, and sent these samples to Dr. Hayward of Detroit for analysis; that the analyses received from Dr. Hayward are as follows:

"Bacteriological Water Analysis.
"Sample—Up.
"Received 11/29/09, from Dr. J. D. Brook, Grandville, Mich.
"Condition of sample: Sealed and iced.

"Number of bacteria per c. c. on agar at room temp.: 10,500.

"Number of bacteria on agar at 37 c.: 1,100.

"Number of red colonies on litmus lactose agar, per c. c.: None.

"Gas production in 2 per cent. detrose bouillon: None.

"Approximate composition of gas formed.

"Indol production: None.

"Milk coagulated: None.

"Colon identified: None.

"Animal inoculation: Animal recovered in 48 hours.

"E. H. HAYWARD, M. D. F. C. S.,
"Bacteriologist."

"Bacteriological Water Analysis.

"Sample—Down.

"Received 11/20/09, from Dr. J. D. Brook, Grandville, Mich.

"Condition of sample.

"Number of bacteria per c. c. on agar at room temp.: 38,000.

"Number of bacteria on agar at 37 c.: 5,100.

"Number of red colonies on litmus lactose agar, per c. c.: 510.

"Gas production in 2 per cent. detrose bouillon: 30 per cent.

"Approximate composition of gas formed: $\frac{CO}{H}2 = \frac{1}{2}$.

"Indol production: Yes.

"Milk coagulated: Yes.

"Colon identified: Yes.

"Animal inoculation: Death in 24 hours.

"E. H. HAYWARD, M. D. F. C. S.,
"Bacteriologist."

To meet the testimony of complainants, the defendants did not call witnesses who were inhabitants of Grandville, or persons who had intimate knowledge of the conditions at Grandville. The testimony on the part of defendants may be said to be that of three classes of persons: (1) Those who reside or own property upon or near the river bank outside of Grandville, but who have visited that place infrequently, and who do not testify to actual conditions at Grand-

ville at the times with reference to which the specific complaint is made. (2) The testimony of persons who formerly resided near the river and upon farms which were overflowed, but who removed therefrom several years ago, and who, within the past 8 or 10 years, have been upon the overflowed area outside of Grandville infrequently. (3) The testimony of physicians mostly, called as experts, who made two or more trips down the river, either by boat or along the bank, some of which trips were made as late in the fall as the month of November, when it is urged by the complainants that the real conditions giving rise to this suit could not be discovered. Most of this class of witnesses testified that they discovered no evidence of nuisance at Grandville.

This testimony is largely dependent upon the premise that no material particles of sewage reached Grandville or points beyond; but we shall refer to this testimony and show that upon cross-examination many of the witnesses testified that the sewage would not have disappeared when the water reached Grandville, but that the sewage was disintegrated. It may be said that it is the claim of these witnesses that the sewage could not create a nuisance at Grandville because it was thoroughly disintegrated. There is much evidence in the record of testimony of witnesses, who had worked upon government dredges upon the river, that much floating substance was found around their scows at and above Grandville while putting in wing dams. Most of this testimony related to times before the depositing of sewage in the Prescott street sewer. That all of the sewage which reached Grand river after September, 1909, was not disintegrated is made clear by this record. In fact, there is no claim that the sewage which entered the river from the sewers other than the Prescott street sewer was ever disintegrated, which may account for the presence of the substances found in the river at or near Grandville.

Dr. M. C. Sinclair, a witness for defendants, testified that he had practiced medicine in Grand Rapids for 30 years; that he had been a member of the State board of health for 5 years, and a member of the city board of health 6 years; that Dr. Shumway, secretary of the State board of health, and the witness were consulted about dumping night soil into the Prescott street sewer; that they reached the conclusion that such discharge of night soil was necessary; that this night soil was discharged into the sewer with heavy water pressure—60 pounds to the square inch at the Prescott street sewer—so as to be thoroughly disintegrated; that it would not be any more objectionable than sewage going into the river in the ordinary way; that he was acquainted with Grandville and the country between there and Grand Rapids along Grand river; that outside of the November, 1909, trip he discovered no indication of sewage between Grand Rapids and Grandville, nor had he detected any particular odors; that some years ago he used to drive to Jenison (one mile below Grandville) and had been along the bank through Grandville two or three times. Of late years he had not been along the river. He could not say that he discovered particular odors in going back and forth along the river; that he went down on the river several years ago; that Dr. Shumway approved the proposition of dumping night soil into the Prescott street sewer to continue temporarily until the installation of a septic tank to take care of the sewage; that there is no danger from the water unless used for culinary purposes; that it is not a menace to the public health, nor to farmers living along the river who do not drink the water; that it might take several years to install a septic tank; that his judgment would be, from what little he knew about matters of that kind, it would probably cost $300,000 to $500,000, more or less, to install a septic tank system; that Grand river is a large stream; that the city's sewage goes into it,

and he knows approximately the quantity produced by each person, that there would be no danger from the sewage four to seven miles below the city, unless used for drinking and culinary purposes, and no nuisance to adjacent property owners; that it is a couple of miles from the outlet of Prescott street sewer along the river to the city limits; that if there were odors the people in the city would get them more than those below, and he had heard no complaint from them; the further from the city the less the odor; that he went down the river in November, 1909, with other physicians; was requested to go by the city board of health; that they stopped along the banks at one or two places to see what they could find; there was some evidence of fecal matter three-quarters of a mile below Prescott street sewer, yet he did not discover any with ocular examination; that the people in the city along the river got more odors than those below; they made one stop below the last point mentioned, being one mile, or three-quarters of a mile, below the Prescott street sewer above mentioned, and discovered no evidence of sewage or odor along or upon the bank of the river, or in the water; they did not stop anywhere else until they reached Grandville; they went down mostly on the east side of the river; that he examined ten or a dozen privies in Grandville in an unsanitary condition, some practically full, and the odors strong from many of them; he could not say that they were in the overflowed district; there would be more or less odor from them in the village, the distance depending upon the wind. In his opinion the condition of the village privies was more dangerous than that of the river.

Upon cross-examination this witness testified that Dr. Shumway's opinion was that the Prescott street sewer would be used only as a temporary expedient, his reason being the same as that of the witness that all sewage should be purified before being emptied

into rivers; that from the discharge of sewage into
rivers there is some danger of contamination, provid-
ing they use the water; the danger may come from
seepage from the river into wells; it would be worse
if the water overflowed into where the wells were;
the typhoid germ is most feared, but other bacilli are
carried by water, not necessarily harmful, but yet they
might produce dysentery and things of that character;
that the city could find no dumping ground for its
night soil without going five or six miles into the
country; that they chose the river as the lesser of the
two evils; that the ideal plan of caring for sewage is
to purify it in septic tanks; that takes away as many
of the dangers as possible before the discharge; that
his answer as to the cost of the sewage disposal plant
was merely an off-hand opinion; that he was not
capable of passing upon that; that Mr. Pierson's
opinion would be better than his; that witness' idea
of a $300,000 to $500,000 plant was one that would
take care of the city for 20 years to come; that there
would be no difference in the contaminating character
of night soil collected from outside privies and ordi-
nary sewage; disintegration aids purification, releas-
ing the gases more quickly; that they discovered evi-
dences of fecal matter a mile down the river, that was
the last place witness left the boat; that it was not
impossible for sewage to collect around the dredges
outside of Grandville; it is possible for it to be carried
that far; so long as it is present in visible particles,
decomposition is not complete and there would be an
odor; scientifically, the process of decomposition is
not complete in a stream for a distance of 30 or 40
miles, depending upon the local conditions; it always
depends upon the proportion of sewage to water; it
would be inadvisable to use river ice opposite Grand-
ville; the bacteria in the ice might continue alive for
months. Witness' judgment is that the sewage spread
out at Grandville in an overflow would be so attenuated

as to practically eliminate the odors; as the water seeps away, foreign substances would become more concentrated. He would not say that if a slime were left upon the ground part of it would not come from the sewage; he would not say it was impossible to get a distinct odor from sewage from the overflowed area at Grandville, if witnesses testified to it; slime may be produced from a number of things aside from sewage; the presence of sewage odor would depend upon many conditions; you could not say positively whether it would produce an odor until you examined every condition; he could only say that it might be possible, but not probable; he did not think that any odor there might be sufficient to produce a nuisance. Some odors from decomposing vegetation are very distinct; a man accustomed to it would be apt to recognize a pronounced sewage odor, and would not confuse it with vegetation; if one odor dominated you would be able to say what it was. The day witness went down the river was cool; the river would not be so apt to smell on a cold day. Witness' knowledge of the river for six or seven years, except his trip down, has been meager; his opinion is that they get no odors from the sewage at Grandville; at least he detected none the day he was there; that he was never in Grandville at or immediately after an overflow; and that the presence or absence of typhoid fever in Grandville does not indicate that there are no typhoid germs in the refuse matter, or that there is no danger from it.

Thomas Ainge, a witness for defendant, testified that he resided in Lansing, and had been a sanitary engineer upwards of 25 years, and was at the time sanitary engineer and acting State medical inspector of the State board of health, having acted in that capacity since October, 1895; that he attended to the sanitary features of public buildings, the office correspondence about sanitary engineering work, and as-

sisted and gave advice to local boards of health, and any one looking for advice along sanitary engineering lines; that from 1884 to 1888 he was engaged in public sanitary work for London, Bristol, and Liverpool, England; that from the latter date to 1895 he was doing private work on recommendation of the secretary of the Michigan State board of health. He testified that he was familiar with Grand river; that Lansing, with a population of 30,000, turns its sewage into Grand river, which is much less in volume than at Grand Rapids; that several rivers flow into Grand river before it reaches Grand Rapids (naming them); that the State Board of health was consulted with regard to the disposal of night soil of Grand Rapids at the Prescott street sewer; that the secretary of the board approved the plan conditionally, permitting it until the method of disposing of sewage could be changed; under the circumstances they considered it a proper method of disposing of the night soil; that witness came to Grand Rapids in May, 1909, and met Dr. De Lano, and went down the east side of the river to Grandville to observe the river, the village, and the lay of the country; that the volume of water and dilution of the sewage was great there, and he did not notice anything that would be considered a source of nuisance, and did not see that it would be produced by what night soil would be put into the Prescott street sewer; the plan was to empty night soil under a powerful stream of water which would pulverize and disintegrate it; that he had knowledge of the effect of running water upon sewage, and would not expect to find anything in the river at Grandville of a solid nature that would be perceptible as excreta; it would be liable to be so diluted as to be invisible; that he took a sample of water from the river, which was submitted with a sample taken from above the city, to the State bacteriologist for analysis; that he saw nothing in the river that indicated sewage sub-

stances; he would not expect to with such a volume of water as was then flowing in the river.

On cross-examination the witness testified that he had not the result of the analysis of those samples; that they were sent to Grand Rapids in the form of an affidavit; that the present tendency is to purify streams and relieve them from sewage effects as much as possible; that has been the object of all State boards of health in recent years, and was the purpose of the commission known as the Lake Michigan water commission; that the tendency of purification and relief of streams grows from the noticeable pollution of many streams; that they would not recommend the use of streams for sewage discharge where odors were created; that they stated that this plan might be used by Grand Rapids as a temporary expedient; the indorsement was made conditionally that the proposition was presented to them from the standpoint of the city of Grand Rapids as a necessity to the city; the night soil had to be taken care of. The reservation was made that the city of Grand Rapids might extend its sewer system into other localities; that, when witness talked with Dr. Shumway about the expedient of dumping night soil into the sewer, he knew nothing of the conditions lower down, nor whether the volume or flow of sewage was sufficient to create a nuisance there or not; that upon later examination he took into account the lower water. The witness did not know how low the river gets normally at Grand Rapids or Grandville; he imagined you could walk across the river at some places in Grand Rapids during low water without much more than getting the shoe tops wet; he could not say as to Grandville; whether it was one foot or three would have considerable bearing on whether the river could carry the sewage without creating a nuisance there; you must know the condition in summer to be able to state positively whether the river could carry the sewage with-

out creating a nuisance; it is generally understood that if the relation is ten parts of water to one of sewage it is a safe mixture. Hazen makes that statement. They take a minimum basis of one to ten in the carrying capacity of rivers in their department; that they would not anticipate a very considerable nuisance from sewage covered with water; that if left on the bank at Grandville it might create an odor, and probably would; that disintegration of sewage in water does not cause it to disappear; it is still there; there is still disintegrated sewage in the water at Grandville; the process of purification would be about begun; there would not be extensive purification at Grandville; if you ran the water through a filter, witness would not expect to find anything more than a fine deposit, a portion of which would be of an organic character; and, if it were allowed to remain away from the water for any length of time, it would give off an odor. Witness further testified that he did not apprehend any danger from the finely divided sewage at Grandville; that his conclusions were based upon the assumption that nothing but this finely divided sewage would go as far as Grandville; that his opinion would not have been different if perceptible solids were to go that far. He limited his answer to the water confined in the stream; that his opinion would not go to the effect of an overflow where the water was permitted to seep away; that is a different proposition; in cases of that kind even finely divided sewage might leave an odor if there was enough of it; if the sewage were in sufficient quantities, he would apprehend a nuisance from it; that the ratio of one to ten would not apply there, if it was permitted to seep away through the soil; there would be nothing to prevent it from becoming a nuisance if left high and dry on the ground. Witness would not want to say that that would be so of a ratio of 1 to 150, because sewage is

put into land and thus disposed of, with no nuisance to the surrounding locality; it would be an open question whether sewage of a dilution of 1 to 150, poured upon the land in large quantities, might create an odor; that no one could say without having tried it; the inference is that there would be a nuisance, though that would depend on the length of time the water stood there and the character of the soil; it would be impossible with that dilution and proper local conditions for enough sewage to be left to create an odor.

There was also evidence offered on behalf of complainants that by the construction of a wall at Grandville, at an expense of $30,000 to $50,000, the flooding there could be prevented. The judge of the superior court dismissed the bill upon the merits.

The complainants have appealed, and the case was argued by counsel for the respective parties. Many authorities are cited in the briefs of counsel.

It is the claim of complainants' counsel that from the cases cited by him the following rules may be stated:

(1) A municipal corporation has no greater right to pollute the waters of a river or watercourse, or to create a nuisance therein, than has any individual.

(2) And if such a municipal corporation creates a nuisance through the discharge of its sewage into a watercourse, it may be restrained therefrom.

(3) There can be no prescriptive right to create a public nuisance.

(4) The discharge of sewage for a considerable period in a particular manner may possibly create prescriptive right to continue to discharge it in the same manner as against an individual, but not as against the public, and there is no prescriptive right to increase the discharge or to increase the nuisance resulting therefrom.

(5) The rights of the riparian owners on a stream to the use of the water are property rights, and those

rights cannot be restricted, limited, or destroyed by permitting, through statutory enactment or otherwise, a municipal corporation discharging its sewage into the river above them. Such rights can only be affected through the exercise of the right of eminent domain and making full compensation to the owner.

(6) It is not even essential that the present nuisance be such as to create a condition which is intolerable to the persons affected by it. If there is a degree of annoyance to them, and the water is polluted, and its value slightly impaired, or the health conditions slightly affected, and it can be seen that the effect of continuing to discharge the sewage will increase the nuisance, an injunction will issue.

(7) The fact that the health and convenience of one part of the public, or of a particular municipality, will be best subserved by discharging sewage into the stream makes no difference.

. It is the claim of defendants that under the evidence in the case the complainants have failed to show that a public nuisance has been created, or exists, for which defendants are responsible. It is their claim: *(a)* That the sewage is thoroughly disintegrated and has disappeared by the time it reaches Grandville; *(b)* that the nuisance, if any exists, results from the decaying vegetation upon the ground caused by the area being submerged; *(c)* that the conditions complained of result from certain privies located in the overflowed area in Grandville; *(d)* that this condition is increased by the refuse from the gas factory, the glue factory and refuse from certain tanneries located on the river bank, which goes into the river; *(e)* that the condition results in part from the discharge of sewage into the river by municipalities above the city of Grand Rapids; *(f)* that the refuse of manufacturing establishments located upon the river, including canning factories, and dead animals in the stream, affect the conditions. We have examined the testi-

mony very thoroughly relating to each of these claims. We cannot, in the nature of things, repeat that testimony.

In our opinion the equities of the case are with the complainants, and the testimony makes out a case of public nuisance. It clearly appears by a preponderance of the evidence that the disintegrated sewage continues in the river until it passes Grandville, and that decomposition of the sewage is not complete by the time it reaches Grandville; that so long as decomposition continues, and until its process is completed, the sewage gives off gases; and that, so long as the sewage continues to give off gases, there are odors.

The complainants' witnesses testified to odors and conditions at Grandville sufficient to create a nuisance. Their testimony is of an affirmative character and is based upon actual knowledge of conditions. It is true that many of defendants' witnesses testified to the absence of odors. That testimony either does not relate to conditions at Grandville or does not relate to conditions at the time when complainants' witnesses testified to conditions amounting to a nuisance, or it is based upon general conclusions, supposedly scientific, that sufficient sewage could not go as far as Grandville to cause the nuisance complained of. The evidence on behalf of defendants relating to the facts is largely of a negative character, and when closely scanned is not inconsistent with the claim of complainants.

An extended discussion of the authorities cited by counsel would render this opinion of an unwarranted length. We shall content ourselves with citing authorities, with some few extracts therefrom.

If the city of Grand Rapids in emptying its sewage into Grand river, as shown by the evidence, creates a nuisance to the public or riparian proprietors below the city, the continuance or creation of that nuisance

may properly be restrained by injunction, and the attorney general is a proper complainant.

In *Missouri* v. *Illinois*, 180 U. S. 208 (21 Sup. Ct. 331), a bill to restrain the pollution of the waters of the Mississippi river by emptying into it the sewage of Chicago, through the drainage canal, was demurred to; two of the grounds being that it was not a proper subject for an injunction, and that, as the State was not interested, it was not properly instituted by the attorney general on its behalf. The United States Supreme Court overruled the demurrer and held that the proceeding did affect the public at large, presented a case for equitable inquiry, and stated, among other things:

"The health and comfort of the large communities inhabiting those parts of the State situated on the Mississippi river are not alone concerned, but contagious and typhoidal diseases introduced in the river communities may spread themselves throughout the territory of the State. Moreover, substantial impairment of the health and prosperity of the towns and cities of the State situated on the Mississippi river, including its commercial metropolis, would injuriously affect the entire State."

The court further said, quoting from *Attorney General* v. *Aqueduct Corporation*, 133 Mass. 361:

" 'The cases are numerous in which it has been held that the attorney general may maintain an information in equity to restrain a corporation, exercising the right of eminent domain under a power delegated to it by the legislature, from any abuse or perversion of the powers, which may create a public nuisance or injuriously affect or endanger the public interests' "— citing many cases.

Can it be said that the city of Grand Rapids, by reason of its being a city of considerable size on the banks of this river, which must in some way dispose of its sewage, has any right superior to the ordinary riparian owner which will permit it to cast its refuse

matter into the river to be thereby carried away to the injury of the riparian owners, and to thereby not only limit the usefulness of the water, but also to create in it a continuing nuisance?

Undoubtedly the city has the right to make a reasonable use of the waters of the river as a riparian owner. Our attention has not been called to any statute giving the city the right to use Grand river below its limits as a sewer for the purpose of carrying away its waste and refuse in an unreasonable manner; and, if it were attempted by statute to give such a right, the statute would be unconstitutional, unless it first provided that the owners of property along the river should be compensated for damages to be first determined by constitutional methods for destruction of such property rights. The city may be treated as a riparian proprietor, and as such riparian proprietor it has no right to destroy the use of the water to other riparian proprietors, and it may not unreasonably increase the burden to lower riparian proprietors by carrying from a distance, by artificial means, refuse substances which would not be naturally deposited therein, thereby causing the pollution which would destroy the use of the water to the lower riparian owner. If the city creates, or threatens to create, a public nuisance, particularly outside of its corporate limits, it is subject to the same rules as would be a private individual, particularly when in the creating of such nuisance it acts not in a governmental, but in a private, capacity. In principle, we think the questions involved in this case have been covered by our own decisions. *Pennoyer* v. *City of Saginaw*, 8 Mich. 534; *Ashley* v. *City of Pt. Huron*, 35 Mich. 296 (24 Am. Rep. 552) ; *Seaman* v. *Marshall*, 116 Mich. 327 (74 N. W. 484) ; *Township of Merritt* v. *Harp*, 131 Mich. 174, 177 (91 N. W. 156) ; *Onen* v. *Herkimer*, 172 Mich. 593 (138 N. W. 198).

In this case the city is maintaining and threatening

to increase, and in fact under the testimony has largely increased, what must be denominated a public nuisance. It is interfering not only with the property and personal rights of the persons affected, but in a large degree with the rights of a large community of people by inflicting irreparable injury, which it is the peculiar office of a court of equity to prevent. There are numerous cases in other States of the Union and in England in which municipal corporations have been prevented and restrained from creating and maintaining nuisances through the discharge of sewage into watercourses and rivers, and the rule seems to be well stated that, where an unreasonable pollution of the water, amounting to a nuisance, or impairing the rights of the lower riparian proprietor, is created or maintained, an injunction will issue to restrain its continuance. More than 50 cases are cited in complainants' brief in support of this position.

In High on Injunctions (4th Ed.), § 810, the rule with regard to injunctions against municipalities to restrain them in the creation of nuisances through the discharge of their sewage is well stated. Gould on Waters, §§ 545, 546; Joyce on The Law of Nuisances, §§ 284, 285; *Attorney General* v. *City of Paterson,* 58 N. J. Eq. 1 (42 Atl. 749); *Id.,* 60 N. J. Eq. 385 (45 Atl. 995, 48 L. R. A. 717, 83 Am. St. Rep. 642), and cases there cited.

In *Butler* v. *Village of White Plains,* 59 App. Div. (N. Y.) 30 (69 N. Y. Supp. 193), the village operated a sewage disposal plant, the affluent from which was deposited in a river on which the plaintiff was a lower riparian owner. The discharge at times produced a foul and offensive odor over plaintiff's lands and polluted the water of the stream. It was held that, as the plaintiff had a right to a reasonable use of the river in its natural flow and purity, it was a nuisance, and equity would restrain the same.

In *Morgan* v. *City of Danbury,* 67 Conn. 484 (35

Atl. 499), the city of Danbury discharged its sewage into the Still river, which, during the warm season, had scarcely any flow. The water became polluted, and its use to the riparian owner was impaired, the cattle refused to drink it, and at the suit of the lower riparian owners the city was restrained from continuing the nuisance.

In *Chapman* v. *City of Rochester*, 110 N. Y. 273 (18 N. E. 88, 1 L. R. A. 296, 6 Am. St. Rep. 366), an injunction was likewise issued to restrain the pollution of the stream by a municipal corporation.

In *Peterson* v. *City of Santa Rosa*, 119 Cal. 387 (51 Pac. 557), perpetual injunction was issued in an action by a riparian owner to restrain defendant, a municipal corporation, from polluting the waters of Santa Rosa creek by discharging into it above plaintiff's lands sewage from the city.

The doctrine of prescriptive right does not apply here for two reasons: *First*, there can be no prescriptive right to create a public nuisance; and, *second*, there has been a great increase of the discharge of sewage into the river within the 15 years before the bill was filed. 30 Am. & Eng. Enc. Law (2d Ed.), p. 383.

In *Goldsmid* v. *Improvement Com'rs*, L. R. 1 Ch. 349, the pollution of a stream by the discharge of sewage from a town therein which was complained of had been going on for over 20 years, and was continuous, and was sought to be maintained on the ground of prescriptive right. It was held, however, that such prescriptive right had not been acquired, because, during the early period, the discharge of the sewage did not prejudicially affect the lower riparian owners on account of the small amount discharged, and became prejudicial only when, from the increase in the size of the town, a greater amount was discharged.

The prescriptive right to pollute the water is limited to the use which has been made of it, and, in case

new use is attempted which renders the stream much more foul, the lower proprietor may recover for the injury done him. *Moore* v. *Webb,* 1 C. B. (N. S.) 673.

There can be no prescriptive right to pollute a stream by the discharge of sewage in such a manner and to such an extent as to be injurious to public health. Even assuming that a prescriptive right to foul a stream with sewage can be acquired, such must be restricted to the limits of it when the period of prescription commenced; and if the pollution be substantially increased, whether gradually or suddenly, the court will interfere by injunction to prevent the wrongful excess; and, if it be impossible to separate the illegal excess from the legal user, the wrongdoer must bear the consequences of any restrictions necessary to prevent the excess, even if it unavoidably extends to the total prohibition of the user. *Blackburne* v. *Somers,* L. R., Ir. 5 Eq. 1.

If a prescriptive right has been acquired to pollute the water to some extent, the one having the right will not be permitted to increase the pollution without being liable to an action. *McIntyre* v. *McGavin* (1893), A. C. 268.

No person is entitled on the ground of ancient custom to the privilege to collect a mass of sewage matter and pour it at one point into a stream in such a quantity that the river cannot dilute it on its passage down to the lower riparian proprietors, as the effect of such an act is to create an evil which must be illegal, being such as no custom can authorize. *Attorney General* v. *Richmond,* L. R. 2 Eq. 306.

In *Attorney General* v. *Halifax,* 39 L. J. Ch. N. S. 129, the court granted an immediate injunction restraining a city from increasing the discharge of sewage into a brook, and an injunction to take effect after the expiration of the year restraining the existing discharge unless the sewage should be purified and de-

odorized; it appearing that the nuisance from the discharge was gradually increasing.

In *Morse* v. *City of Worcester*, 139 Mass. 389 (2 N. E. 694), the court, in discussing the liability of the city for creating a nuisance by throwing its sewage into the stream, states that it cannot be supposed the legislature in giving the right to use the stream intended to authorize the commission of the nuisance unless it was absolutely necessary, and that it would be liable if it was negligent in the manner of constructing the works or in failing to purify the sewage before it entered the stream. And the same general principle is found in *Merrifield* v. *City of Worcester*, 110 Mass. 216 (14 Am. Rep. 592), and in *Washburn & Moen Manfg. Co.* v. *City of Worcester*, 116 Mass. 458.

The general rule is that sewage cannot be cast into the stream to such an extent as to pollute it. Sewage cannot be thrown into the stream in such a way as to render the water foul and unfit for use. *Goldsmid* v. *Improvement Com'rs, supra; Bidder* v. *Board of Health*, 6 L. T. N. S. 778; *Peterson* v. *City of Santa Rosa, supra*.

A city cannot, without direct legislative authority, pollute a stream with its sewage to the injury of lower proprietors. And it cannot be done by legislative authority without making compensation to the injured riparian owners. *Nolan* v. *City of New Britain*, 69 Conn. 668 (38 Atl. 703).

A municipal corporation cannot cast its sewage into a stream in such a manner as to pollute the pond of a lower riparian proprietor which he uses for domestic purposes, the propagation of fish, and the supply of ice. *Chapman* v. *City of Rochester, supra*.

The city will be liable for polluting a stream with sewage in such a way as to spoil the water supply of a proprietor lower down. *Good* v. *City of Altoona*, 162 Pa. 493 (29 Atl. 741, 42 Am. St. Rep. 840).

A city may be enjoined from emptying sewage into a stream. *Village of Dwight* v. *Hayes,* 150 Ill. 273 (37 N. E. 218, 41 Am. St. Rep. 367), affirming *Hayes* v. *Village of Dwight,* 49 Ill. App. 530; *Robb* v. *Village of La Grange,* 158 Ill. 21 (42 N. E. 77).

In *Spokes* v. *Board of Health,* L. R. 1 Eq. 42, the court, in speaking of the discharge of sewage into a river, asked:

"What difference can it possibly make as to the commission of an illegal act, whether a man acts on behalf of thousands or on behalf of himself only?" ·

It is urged very earnestly that defendants' right to use the river in the manner it is used in disposing of sewage is superior to the rights of complainants, because of the magnitude of their right and the necessity to dispose of the sewage of the city.

It is a sufficient reply to this argument to say that it long has been the fundamental law of the land that no man is to be deprived of his property without due process of law and without compensation. *Stock* v. *Township of Jefferson,* 114 Mich. 357-361 (72 N. W. 132, 38 L. R. A. 355) ; *Beach* v. *Zinc Co.,* 54 N. J. Eq. 65 (33 Atl. 286) ; *Town of Shelby* v. *Power Co.,* 155 N. C. 196 (71 S. E. 218, 35 L. R. A. [N. S.] 488, Ann. Cas. 1912C, 179, and note) ; *Thompson* v. *City of Winona,* 96 Miss. 591 (51 South. 129, Ann. Cas. 1912B, 449, and note) ; *Markwardt* v. *City of Guthrie,* 18 Okl. 32 (90 Pac. 26, 9 L. R. A. [N. S.] 1150, 11 Am. & Eng. Ann. Cas. 581, and note). See note to *O'Donnell* v. *City of Syracuse,* 6 Am. & Eng. Ann. Cas. 177.

In *Winchell* v. *City of Waukesha,* 110 Wis. 101 (85 N. W. 668, 84 Am. St. Rep. 902), it was held that the sewer as maintained constituted a nuisance, and that plaintiff was entitled to an injunction restraining defendant from using the stream, unless the sewage was first deodorized, since, in the absence of legislative authority, a city has no greater rights to pollute a

navigable stream than a private individual. *Todd* v. *City of York*, 3 Neb. (Unof.) 763 (92 N. W. 1040).

In the recent case of *Penn American Plate Glass Co.* v. *Schwinn* (Ind.), 98 N. E. 715, the supreme court of Indiana discussed the difference between the diversion or detention of the waters of a stream by an upper riparian proprietor to a reasonable use and the introduction into the stream of foreign substances, rendering its waters unfit for use by lower riparian proprietors, and held that what is a reasonable use is a question of fact. That court also criticised the earlier Indiana cases and the Pennsylvania rule, and said:

"There is, perhaps, one line of distinction which, in the opinion of the writer of this opinion, is unsound, and that is an exception in favor of cities making avail of streams for sewerage without liability. That doctrine grew up from a supposed necessity; but the same reasons which seemed to be grounds for the exception to the rule in regard to pollution of streams by cities are the very ones which must sooner or later reverse it. It is a matter of common knowledge everywhere, and the subject of recent legislation in this State, that the streams of pure and limpid water, which formerly traversed the State, have become cesspools of filth and breeders of disease, and polluted to nausea; and we must certainly, and the sooner the better for the State and its inhabitants, take steps necessary to the removal of sewage from our streams and their restoration to their natural condition."

The doctrine that necessity is no defense to unreasonable pollution of a watercourse is supported by the following cases: *Straight* v. *Hover*, 79 Ohio St. 263 (87 N. E. 174, 22 L. R. A. [N. S.] 276); *Hunter* v. *Coal Co.*, 16 Ky. Law Rep. 190; *Beach* v. *Zinc Co.*, *supra; H. B. Bowling Coal Co.* v. *Ruffner*, 117 Tenn. 180 (100 S. W. 116, 9 L. R. A. [N. S.] 923, 10 Am. & Eng. Ann. Cas. 581); *Day* v. *Coke Co.*, 60 W. Va. 27 (53 S. E. 776, 10 L. R. A. [N. S.] 167). But it is earn-

estly contended by counsel for defendants that these views are opposed to the Michigan rule, and they cite *People* v. *Hulbert,* 131 Mich. 156 (91 N. W. 211, 64 L. R. A. 265, 100 Am. St. Rep. 588), and *Phillips* v. *Village of Armada,* 155 Mich. 260 (118 N. W. 941).

In *People* v. *Hulbert, supra,* it was held that a riparian owner on a lake has a right to bathe therein, as against a city drawing its water supply from the lake under a like ownership; and that the rights of the several riparian proprietors on a stream or an inland lake are equal, each being entitled to a reasonable use of the water, though such use may, to some extent, prejudice the other proprietors by impairing the quality of the water or by diminishing its quantity. The question involved in such a case is one of reasonable use and may be said to be a matter of degree. A careful reading of the case of *People* v. *Hulbert, supra,* will disclose that in the authorities cited this court kept prominently in view the question of reasonable use of the water by the upper proprietor. It was said that "any" use of the—

"Water which defiles and corrupts it to such a degree as essentially to impair its purity, and prevent the use of it for any of the reasonable and proper purposes to which running water is usually applied, * * * is an infringement of the right of other owners of land through which a watercourse runs, and creates a nuisance for which those thereby injured are entitled to a remedy."

It was held, however, that bathing in such water was not an unreasonable use of it. The instant case is so readily distinguished from the *Hulbert Case* that further comment is unnecessary.

*Phillips* v. *Village of Armada, supra,* was an action at law for damages arising from the deposit of sewage in an open ditch adjacent to plaintiff's home, and from the ditch into a stream flowing past his property. There was no evidence from which the jury could de-

termine the damage done by the sewer complained of, and other sewers emptying into the same stream, and it was held that the trial court should have eliminated the pollution of the stream from the consideration of the jury, and limited plaintiff's recovery to damages done by the open ditch, and the case was reversed because of this error of the trial court. In the opinion Chief Justice GRANT referred to the case of *People* v. *Hulbert* and said:

"It is very doubtful whether the sewage into the creek by the defendant is not, under the decisions, a reasonable use of the stream. The question is one of great importance to cities and villages located upon the rivers, creeks, and lakes of this State. The use of a stream reasonable at one time and one place may become unreasonable at another time and at another place. The reasonable use of a stream must be determined in the light of increased population, of proper sanitary measures, and the general welfare of the communities affected. The sewerage of villages and cities has become an absolute necessity for the public health. It is not enough to condemn a use as unreasonable because such a use may pollute to some extent the waters of the stream below.  *  *  *  We refrain from further discussing this important question. The question is barely referred to in the brief of counsel for the plaintiff, and its decision is not essential to a determination of this case."

As we have already said, the matter of reasonable use is one of fact, and largely one of degree. Here we are dealing with a case on the equity side of the court with the evidence before us, and the question of a reasonable use of the river is involved and is discussed by counsel. We are of opinion that the *Phillips Case* is not controlling here.

It appears in this case and it is well known that modern scientific research has discovered means of disinfecting and deodorizing sewage so that it is practically innocuous. It also appears that the plan of depositing the night soil into the Prescott street

sewer was permitted and entered upon as a temporary measure only.  But such course has been pursued for a number of years, and, unless some order is made in this case, it is likely to become a permanent practice on the part of the city.  The maxim, "Use your own property in such a manner as not to injure that of another," can equitably be applied to the defendants in this case.  It appears undisputed that the construction of a septic tank or tanks by the defendants within a reasonable time is feasible and practicable, and that thereby the sewage would be relieved from contaminating properties and so purified as to take away the offensive, unhealthful, and nauseating odors.

The decree of the court below will be reversed, and one entered here for complainants restraining the defendant city of Grand Rapids, its boards, officials, servants, and agents from continuing to discharge the sewage of the city of Grand Rapids, which is now discharged into the said Grand river, until the same shall have first been, by the use of a septic tank or tanks, so deodorized and purified as not to contain the foul, offensive, or noxious matter (which it now contains) capable of injuring the complainants or their property, or causing a nuisance thereto; such injunction to become operative one year after the date of the settling of decree.  The complainants will recover of the defendant the city of Grand Rapids their costs of both courts, to be taxed and duly certified.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, and OSTRANDER, JJ., concurred.  KUHN and BIRD, JJ., did not sit.